

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-24-2004

# Xie v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 02-3615

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Xie v. Atty Gen USA" (2004). *2004 Decisions.* Paper 943.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/943

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

———

No. 02-3615

———

XIN JIE XIE,
          Petitioner

v.

JOHN ASHCROFT, Attorney General
of the United States,
          Respondent

———

Petition for Review of an Order of
the Board of Immigration Appeals
(A-70-907-033)

———

Argued October 16, 2003

Before: SLOVITER, ROTH, and
STAPLETON, Circuit Judges

(Filed: February 24, 2004)

———

Marco Pignone, III   (Argued)
Wilson & Pignone
Philadelphia, PA 19103

     Attorney for Petitioner

Robert D. McCallum, Jr.
     Assistant Attorney General
     Civil Division
Terri J. Scadron,

Assistant Director
Anthony W. Norwood
Ethan B. Kanter
John M. McAdams, Jr.
Jennifer A. Parker   (Argued)
United States Department of Justice
Office of Immigration Litigation
Washington, D.C. 20044

     Attorneys for Respondent

OPINION OF THE COURT

SLOVITER, Circuit Judge.

     Petitioner Xin-Jie Xie ("Xie") has filed the pending Petition for Review of the decision of the Bureau of Immigration Appeals ("BIA") dismissing Xie's application for asylum and withholding of deportation under 8 U.S.C. §§ 1158, 1231(b)(3).  In so ruling, the BIA explicitly adopted the adverse credibility finding of the Immigration Judge ("IJ").

**I.**

     Xie arrived in the United States on May 27, 1993 as a nonimmigrant visitor for business.  He testified his company sent him to the United States "for a certain kind of product and merchandise research team." A.R. at 108.[1]  He was authorized to

———

     [1]   There is both an Administrative Record, cited here as A.R., and an Appendix, a portion of which is attached to the petitioner's brief and the remainder in a second volume, which we cite as App.  The opinions of the IJ and the BIA

stay in this country for thirty days. He did not leave when his visa expired and on January 7, 1997, the Immigration and Naturalization Service ("INS") charged him with deportability under 8 U.S.C. § 1251(a)(1)(B). He conceded deportability, but requested relief in the form of asylum and withholding of deportation or, in the alternative, voluntary departure. Xie claims that he "has a reasonable fear of future persecution if he is removed to [China]." Petitioner's Br. at 8.[2] The IJ found that Xie was not credible. The BIA considered Xie's appeal, which it dismissed with an opinion holding that the IJ's adverse credibility finding was supported by the record.

Xie timely filed this Petition for Review and we have jurisdiction under 8 U.S.C. § 1252. When the BIA has rendered its own opinion, we review the decision of the BIA and not the IJ. Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002). In this case, however, for reasons explained hereafter, we also have jurisdiction to review the IJ's decision.

## II.

Xie was married in 1973, and he and his wife have three children, born in 1974, 1977, and 1979 respectively. In his application for asylum, Xie alleged that he seeks asylum because he fathered three children, which violated Chinese national policy of family planning. Xie alleged that he was detained in 1976 after the birth of his second child and was released after his wife had an IUD loop inserted. In his sworn statement supplementing his asylum application, Xie notes that when his wife became pregnant again in 1979 despite the IUD, she went into hiding at a relative's home in another village and Xie went into hiding in yet another village, leaving his children in the care of his parents. Unable to locate either Xie or his wife in their home, the local authorities became angry, broke his door and took some of the furniture; he and his wife lost their jobs and were asked to pay a fine of 5,000 RMB.[3] They did not have the money to pay the fine and "We decided to leave this country. This is why I came to America to seek a better life." A.R. at 308.

In his testimony at the hearing, Xie stated that after his wife had given birth to their daughter in 1979, government birth control officials took her to the Province Hospital where she was forcibly sterilized.

---

appear in both the Administrative Record and the Appendix. We have chosen to cite to them in the Appendix.

[2] The brief actually states, "if he is removed to Serbia" but we assume that was a typographical error.

---

[3] Xie's asylum petition states that he and his wife were fined 5,000 RMB at the birth of their third child. Because there is nothing in the record to indicate that two separate fines were imposed and the alleged 5,000 RMB fine is never again referred to, we will assume he referred to the 9,300 RMB fine discussed infra.

2

Xie claimed that thirteen years later, toward the end of 1992, birth control officials came to his home and ordered him to pay a penalty of 9,300 RMB.[4] Xie testified that after he learned of the fine, he argued with the birth control officials and told them he had no more money; they beat him up, detained him for about a week, and released him because of his wife's connections but told him he had to pay the balance of the penalty due within three weeks. Xie left China in February 1993. His wife and children remain in China.

### III.

In his brief Xie states that he "established a well-founded fear of persecution on account of his political opinion as his wife was forcibly sterilized." Petitioner's Br. at 6. He argues that he is entitled to asylum as a "refugee," defined in the statute as: "any person . . . unable or unwilling to return to . . . [his or her] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42).

In 1996, Congress amended the definition of refugee as follows:

> a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42). The BIA extended this provision to apply to spouses of persons who have undergone coercive birth control procedures. In re C-Y-Z, 21 I. & N. Dec. 915 (BIA 1997).

Neither the BIA nor the IJ reached the merits of Xie's argument that he qualifies for asylum under the statutory definition of refugee. As the Government's brief states, the IJ "denied Xie's claim on the basis of an adverse credibility determination and did not make an alternative finding as to whether Xie's evidence, if deemed credible, was

---

[4]    We find nothing in the record to support the statement in Xie's brief that the penalty was $9,000. Petitioner's Br. at 5. Instead, the IJ stated that after Xie's wife paid the officials 1,300 RMB the balance of 8,000 RMB was equivalent to approximately $1,000.

sufficient to meet his burden of proof." Govt's Br. at 3 n.2. Xie apparently agrees, as his counsel stated at the oral argument before us that the "only issue here is credibility."

In its opinion dismissing Xie's appeal, the BIA held that the IJ's adverse credibility finding is supported by the record. It further stated, "[a] persecution claim that lacks credibility cannot satisfy the burdens of proof and persuasion necessary to establish eligibility for asylum or withholding of deportation. See Matter of M-S-, 21 I. & N. Dec. 125 (BIA 1995); see generally Abdulai v. Ashcroft, 239 F.3d 542 (3d Cir. 2001)." App. at 6-7. We will therefore limit ourselves to the first issue as presented by the Government: "Whether the Board's finding that Xie failed to meet his burden of proof is supported by substantial evidence where Xie's testimony and evidence contained several material inconsistencies, crucial omissions, implausibilities, and was refuted by the State Department Report and Comments?" Govt's Br. at 3.[5]

The BIA failed to find past persecution because it found Xie to be incredible. Our precedent is clear that when the BIA defers to an IJ, we must review the IJ's decision as the final agency decision. See Abdulai, 239 F.3d at 549 n.2. In this case, the BIA both adopted the IJ's adverse credibility determination and discussed some, but not all, of the underlying bases for the IJ's adverse credibility determination. As to the remaining bases, the BIA also stated that "the Immigration Judge found several other inconsistencies and discrepancies between the respondent's asylum application and his testimony." App. at 6.

In Senathirajah v. INS, 157 F.3d 210 (3d Cir. 1998), which also involved an adverse credibility finding based, in part, on an asylum application, we discussed both the IJ and the BIA's decisions. We did not consider the propriety of reviewing both decisions, but we noted that "the BIA's ruling result[ed] in substantial part from the deference it gave the immigration judge's decision," and that the BIA "appear[ed] to have substantially relied upon the adverse credibility ruling of the immigration judge." Id. at 216. Similarly,

---

[5] We therefore will not reach the provocative issues of statutory interpretation touched upon at the oral argument. One of the issues was whether the statutory language that a person who has undergone an involuntary sterilization and a person who has a fear that she/he will be forced to undergo such a procedure "shall be deemed" to have been persecuted on account of political opinion or "shall be deemed to have a well founded fear of persecution"

establish an irrebuttable presumption. Another issue alluded to at the oral argument which we do not reach is the effect of a time gap of more than 15 years between the spouse's sterilization and the application for asylum. We express no opinion on these issues and the Government's brief does not discuss them.

in Miah v. Ashcroft, 346 F.3d 434 (3d Cir. 2003), we examined the decisions of both the IJ and the BIA because the "BIA adopted the IJ's analysis on corroboration while rejecting the IJ's conclusion regarding credibility, a conclusion which influenced the IJ's corroboration analysis." Id. at 439. Likewise, the BIA in the instant case did briefly discuss many of the inconsistencies troubling the IJ and stated that "[it] believe[s] that the inconsistencies and omissions mentioned by the Immigration Judge actually exist in the record." App. at 6. Although it gave only some examples of those inconsistencies, the BIA also appears to have substantially relied upon the adverse credibility finding of the IJ. Accordingly, we have jurisdiction to review both the BIA's and IJ's opinions.

In its decision, the BIA stated:

> We give significant weight to an Immigration Judge's adverse credibility finding. See Matter of A-S-, 21 I&N Dec. 1106, 1109 (BIA 1998); Matter of Burbano, 20 I&N Dec. 872, 874 (BIA 1994). Specifically, we have stated that we accord deference to an adverse credibility finding based upon the inconsistencies and omissions regarding events central to an alien's asylum claim where a review of the record reveals that (1) such discrepancies and omissions actually exist; (2) the discrepancies and omissions provide specific and cogent reasons for the Immigration Judge's credibility determination; and (3) the alien has not supplied a convincing explanation for such discrepancies and omissions. Matter of A-S-, supra, at 1109.

App. at 6.

Adverse credibility determinations are reviewed under the substantial evidence standard. Gao, 299 F.3d at 272 (citing Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998)). Under this standard, the Board's adverse credibility determination must be upheld on review unless "any reasonable adjudicator would be compelled to conclude to the contrary." Id. (citing INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B)) (internal quotation omitted). "[M]inor inconsistencies" do not provide an adequate basis for an adverse credibility finding. Id. Because we conclude that there is no reason to compel a contrary conclusion, we uphold the BIA's finding.

One of the principal inconsistencies and omissions discussed by the BIA as supporting the IJ's finding of lack of credibility was Xie's failure to mention in his written asylum application that his wife had been sterilized. App. at 6. The IJ stated, "If indeed his wife had been sterilized, this would be such a traumatic event in both his and his wife's life that I find it implausible and incredible that this

5

would have been not mentioned to the Immigration officer and would not have been included in the I-589 application." App. at 17. We have reviewed Xie's asylum application and agree. In that application, Xie mentioned that his wife had an "IUD loop" inserted and that he was asked to undergo sterilization (which he apparently declined). A.R. at 308. There was no reference to his wife's supposed forced sterilization. Given Xie's appreciation of the relevance of compelled birth control, the BIA's concern about Xie's failure to mention his wife's forced sterilization in his original written asylum application is well taken. This is indeed a significant event that one is not likely to forget.

The BIA also noted the inconsistency with respect to Xie's claimed detention. In his asylum application, Xie stated that he was detained in 1976 after the birth of his second child[6] and was released only after his wife had an IUD loop inserted. The BIA pointed out that the IJ noted that Xie testified that he was detained after the birth of his third child (which was in 1979). App. at 6. The IJ noted an inconsistency regarding Xie's detention within the same application because he responded to question 22 that he was not detained but to question 18 that he was detained after the birth of his second child. Finally, both in Xie's supplemental statement and his testimony he states that he was detained in 1992 following the fight he had with officials regarding his payment of the fine, which the IJ noted differed from the response given in his asylum application. App. at 18. Moreover, Xie's asylum application did not mention any fight with officials. Inasmuch as Xie further testified that he was only detained once, these inconsistencies cannot be reconciled.

We believe the inconsistency regarding Xie's detention is material. He purported to be able to tie the date of his detention to a particular event. The IJ found that this inconsistency "severely weakened" Xie's credibility. App. at 18.

The BIA also concluded that Xie's testimony was not consistent with the implementation of the one-child policy. App. at 6. Xie claims that his wife was forcibly sterilized in October of 1979 but the BIA noted the date because "the 'one-child' policy was not promulgated until 1979 or 1980," (citing Bureau of Democracy, Human Rights & Labor, China–Country Conditions and Comments on Asylum Applications (Dec. 11, 1995)), and "the birth control policy was not implemented at the grass roots level until the early 1980s." App. at 6. Xie criticizes the BIA's interpretation of the China Country Report as stating when grassroots implementation of birth control policies began. The Government retorts that the

---

[6] We note parenthetically that it appears that his second child was born July 13, 1977, A.R. at 88, 145, but this is not the relevant inconsistency as failure to remember the precise year of a detention 15 years earlier may be explicable. A different inconsistency is noted in the text.

6

China Report Comments do indeed state that the family planning policy was not promulgated until 1979.

We have previously stated, "Country reports . . . are the most appropriate and perhaps the best resource for information on political situations in foreign nations." Zubeda v. Ashcroft, 333 F.3d 463, 477-78 (3d Cir. 2003) (internal quotation and citation omitted). The relevant part of the China Report states that "[b]y the mid-1970s, China had stepped up efforts to limit population and had begun to popularize the two-child family. In 1979, the PRC promulgated a comprehensive and highly intrusive 'one-child' policy. . . ." A.R. at 285. It continues, "How family planning personnel at the grass roots implemented the policy in the early 1980s has been the subject of particular attention, but criticisms of current methods continue." A.R. at 285.

Even assuming the Report was vague or ambiguous, so long as the BIA could have used the Report to conclude that Xie's sterilization claim is untenable, the BIA is entitled to do so. In INS v. Ventura, 537 U.S. 12, 17 (2002), the Supreme Court reversed a decision of the Court of Appeals for the Ninth Circuit that decided an asylum application instead of remanding to the BIA. The Court noted in dictum that the Ninth Circuit's reliance on the relevant State Department report was in error because the report was sufficiently ambiguous to support the BIA's conclusion. Because the Report relevant to this case expressly refers to the early

1980s in connection with the Chinese government's population control policies, that Report constitutes substantial evidence in support of the BIA's conclusion that Xie's testimony was not consistent with the date of the implementation of the one-child policy.

The BIA also found Xie's "testimony improbable that several months after his fine was imposed for violations of the birth control policies, which he did not fully pay, he was issued an official passport for public affairs on with which he was able to travel to the United States." App. at 6. The IJ also found it not plausible that "the Chinese Government issued him a passport, even though he owed that Government a good portion of the fine that had been levied against him." App. at 15. At the oral argument before us, the Government offered some elucidation of the significance of Xie's having received the passport on which he traveled, as the passport for public affairs is different from the ordinary tourist passport. We believe Xie's attempt during his testimony to explain the receipt of the passport "[b]ecause it was through a friend's connection they gave [him] a list," A.R. at 114, is sufficiently non-responsive and unconvincing to support the BIA's conclusion.

Because the BIA referenced with approval the IJ's findings of "other inconsistencies and discrepancies," we review those inconsistencies even though they were not specifically referred to in the BIA's decision. The IJ noted that Xie stated on his asylum application that after

7

the birth of his third child he and his wife both lost their jobs, but in his testimony Xie stated that he did not lose his job in China. Moreover, there was nothing in the record to reflect that his wife had ever worked in China.

The IJ noted Xie's contradictory testimony regarding when his belongings were confiscated. Xie stated that in July 1979, when he returned to his village to see his children, his parents informed him that Chinese officials had broken down his door and taken all of his belongings while he was away. He also testified that his wife told him that since he has been here in the United States in 1993, the government has taken all of his belongings. Although he testified to two instances when the government confiscated his belongings, both his asylum application and sworn statement discuss only one such incident.[7]

It was also evident that the IJ disbelieved Xie's testimony that he left his wife and children in China and is afraid to return home because he would be required to pay the balance of the fine of about $1,000. Xie had been working in the United States for a number of years, and sent $300 a month back to China for the support of his family. App. at 21. He told his attorney that he has enough money to pay for a trip back to China. The IJ stated that Xie "could have paid this fine while working and living here in the United States. He opted not to do so." App. at 21. It was the IJ's opinion that Xie "is not paying the fine as a excuse for not returning to his country." App. at 21.

Xie's sole explanation for the inconsistencies is to attempt to lay the responsibility on the travel agent who filled out the asylum application. He testified he had no idea what it was. A.R. at 125. The IJ stated:

> the Court will not buy into an individual trying to put blame on either an attorney or a travel agency or anyone else in the completion of the I-589 as a scapegoat to avoid being found incredible because of contradictions and a conflict between the testimony given and the documentary evidence presented. On redirect examination the respondent again stated for the record that he does not know what is contained in his affidavit.

App. at 19. The IJ viewed this explanation as suspect.

In this connection, we note that Xie had a responsible position in China. He was second in command at a factory that manufactured religious incense papers with six or seven employees under him. The IJ stated that he did not believe Xie

---

[7]    Xie's supplemental statement explicitly discusses the 1979 incident; the reference in his asylum application is not dated but it also appears to reference the 1979 incident.

would "just allow[ ] any travel agent to put anything down on [his] application." A.R. at 141. The differences in Xie's accounts of his detention are too specific and too dissimilar to be attributed to the incompetency of the preparer. The strength of these omissions is sufficiently substantial to sustain the BIA's adverse credibility finding. The BIA's assessment of Xie's credibility on the various inconsistencies that it had noted was just as damning, as the BIA stated "[w]e find the respondent's explanations of his inconsistencies to be unconvincing." App. at 6 (citing Matter of A-S, 21 I. & N. Dec. 1106, 1109 (BIA 1998)). Xie argues, "It is unclear why the Board and the Immigration Judge assume that Petitioner controlled the content of his original application. It is apparent that while some information is correct, other information is wrong."[8] Petitioner's Br. at 12. That is

---

[8] The Petitioner also argues that the IJ and BIA reliance on the asylum application when prepared by an unauthorized representative (a travel agent) is a violation of due process. Petitioner brings this argument for the first time on appeal, and therefore there is no record to review on this issue. Section 1252(d)(1) of Title 8 provides that a court of appeals may review final orders only if the alien has exhausted all available remedies, and because this court has described statutory exhaustion requirements as being jurisdictional, Massieu v. Reno, 91 F.3d 416, 422 (3d Cir. 1996), we are without jurisdiction to decide this issue.

not a convincing response to the numerous inconsistencies that the BIA and the IJ noted.

In a number of opinions this court has declined to give much significance to discrepancies in statements made when the applicant has arrived at the point of entry. See, e.g., Balasubramanrim, 143 F.3d at 162-63 ("[T]he hand written record of the airport interview . . . may not be reliable . . . . [T]he airport statement is not an application for asylum. The questions posed were not designed to elicit the details of an asylum claim, and it appears the airport examiner . . . had no interest in developing the details of a potential asylum claim."); Senathirajah v. INS, 157 F.3d at 218 (holding "the immigration judge and the BIA gave far too much weight to the affidavit taken during Senathirajah's airport interview"). Those cases differ from this case. Xie arrived legally on an official visa on May 27, 1993. He did not complete his asylum application until almost a month later. Further, he was not questioned by potentially intimidating immigration officials, but by an agent of a travel agency. There was no reason for him to have been beset by the fear and confusion that immigrants may experience during an airport interview.

We have also noted that "immaterial discrepancies between airport interviews and subsequent testimony should not be used to make adverse credibility determinations." Mulanga v. Ashcroft, 349 F.3d 123, 137 (3d Cir. 2003). However, as explained throughout

9

this opinion, the discrepancies in the instant case go to the heart of the claim.

The IJ concluded that based on his adverse credibility determination, Xie has not established a well-founded fear of persecution if his application for asylum were denied and he was returned to China. Again, based on his view that Xie was not honest, forthright, and credible, the IJ concluded that Xie was not a person of good moral character, and denied voluntary departure. In its decision dismissing the appeal, the BIA did not consider the voluntary departure issue, but inasmuch as it found that the IJ's findings of adverse credibility were supported by the record, there was no need for it to do so.

## IV.

This court has held on more than one occasion that we must sustain the BIA's adverse credibility determination if there is substantial evidence in the record to support it. See, e.g., Gao, 299 F.3d at 272. We discussed the substantial evidence test in a recent en banc decision where we stated, "We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony . . . in view of the background evidence on country conditions." Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003) (en banc) (internal quotations and citations omitted).

After consideration of the record, we conclude that the BIA, and before it the IJ, provided the required "specific, cogent reasons" for the adverse credibility finding.[9] Senathirajah, 157 F.3d at 216.

Nothing in the record compels a contrary conclusion, and accordingly, we will deny the petition for review.

_____

[9] The IJ also based his adverse credibility finding on Xie's demeanor. We are aware of the skepticism of one of our colleagues on the weight accorded to demeanor, i.e. the "squirm" test, which he expressed in his separate opinion in Dia, 353 F.3d at 273-80 & n.8 (McKee, J., concurring in part and dissenting in part). In this case, the IJ explained the basis for his opinion, i.e. that Xie kept his hands "firmly placed in his lap" while testifying to rather easy questions but put his hands in front of his face when asked questions that were difficult to answer. App. at 19. The BIA opinion did not refer to Xie's demeanor and we therefore do not rely on this aspect of the IJ's opinion.