

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-16-2004

# Yang v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3159

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Yang v. Atty Gen USA" (2004). *2004 Decisions.* Paper 494.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/494

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

No. 03-3159

———

FA DAI YANG,
Petitioner

v.

JOHN ASHCROFT,
Attorney General of the United States,
Respondent

———

Petition for Review of an Order
of the Board of Immigration Appeals
(A71-603-628)

———

Submitted Under Third Circuit LAR 34.1(a)
July 15, 2004

Before: SLOVITER, BARRY and WEIS, Circuit Judges

(Filed: July 16, 2004 )

———

OPINION OF THE COURT

SLOVITER, <u>Circuit</u> <u>Judge</u>.

## INTRODUCTION

Petitioner Fa Dai Yang ("Yang"), a native and citizen of China, has filed a Petition for Review from the order of the Board of Immigration Appeals ("BIA") denying Yang's application for asylum and withholding of removal.

## I.

Yang arrived in the United States from China at or near Long Beach, California, on or about April 8, 2000 without appropriate documentation, having purchased fraudulent documents from a "snakehead." The Immigration and Naturalization Service ("INS") interviewer determined as an initial matter that Yang had established a credible fear of persecution and referred him for a hearing before an immigration judge ("IJ") on his claims for asylum, withholding of removal and protection under the Convention Against Torture ("CAT"). Pursuant to Yang's motion, venue was transferred to New York where he filed an application for asylum and withholding of removal. In that application, Yang stated that he feared persecution should he be returned to China on account of his political opinion opposing the Chinese family planning policies. Thereafter, the matter was transferred to Philadelphia.

Both Yang and his second wife, a United States citizen, whom he married on April 9, 2001, testified at the hearing. The IJ, in an opinion dated February 25, 2002, determined that the asylum application was frivolous and denied Yang's request for

2

asylum, withholding of removal under § 241(b)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3), and under the CAT, 8 C.F.R. § 208.16. The BIA affirmed the decision of the IJ except that it did not join in the IJ's determination that the asylum application was frivolous. It dismissed the appeal.

In his Petition for Review, Yang asserts that the BIA's ruling should be reversed because (1) the IJ's adverse credibility finding was not supported by substantial evidence, and (2) the IJ erred in finding that Yang's divorce from his ex-wife and his subsequent remarriage bar him from qualifying for asylum. Ordinarily, this court reviews decisions of the BIA. However, where the BIA does not render its own opinion and instead adopts the opinion of the IJ, this court will review the decision of the IJ as the final determination of the agency. See Dia v. Ashcroft, 353 F.3d 228, 240 (3d Cir. 2003).[1]

The IJ must give specific reasons explaining an adverse credibility determination, and this court is to "evaluate those reasons to determine whether they are valid grounds upon which to base a finding that the applicant is not credible." Balasubramanrim v. INS, 143 F.3d 157, 162 (3d Cir. 1998) (quoting Mosa v. Rogers, 89 F.3d 601, 604 (9th Cir. 1996)). This court regards the IJ's adverse credibility determination as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B). This statute codifies the standard set forth in

---

[1] In the process of arguing his first point regarding the credibility ruling, Yang also asserts that he was denied Due Process under the fifth amendment based on the IJ's bias. We reject that contention. Yang has produced no evidence of bias, and we see none.

INS v. Elias-Zacarias, 502 U.S. 478 (1992), where the Court stated that if petitioner "seeks to obtain judicial reversal of the BIA's determination, he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Id. at 483-84; see also Sevoian v. Ashcroft, 290 F.3d 166, 171 (3d Cir. 2002) (holding that 8 U.S.C. § 1252(b)(4)(B) codified Elias-Zacarias). In our recent en banc decision, we stated that "where we review an IJ's credibility determination, we must ask whether the determination is supported by evidence that a reasonable mind would find adequate. We look at an adverse credibility determination to ensure that it was appropriately based on inconsistent statements, contradictory evidences, and inherently improbable testimony in view of the background evidence on country conditions." Dia, 353 F.3d at 249 (internal quotation marks and citations omitted).

Yang's testimony to support his alleged fear of persecution should he return to China focused on actions of the Chinese authorities in support of their restrictive family planning policies. Yang's first wife gave birth to their first child, a boy, in November 1998, after which she was involuntarily fitted with an IUD and was required to undergo tri-monthly check-ups. He and his first wife had the IUD removed by a private doctor and, after she became pregnant, moved to her grandmother's house to avoid the Family Planning officials. They decided to leave China, and that he should go first, to be followed by his wife. Yang attempted to leave China illegally in July of 1999, using fraudulent documents. He was caught in Shen Zhen and detained for "more than 10

4

days" and then moved to the Lo Yuan Police station where he was detained for approximately another 10 days. App. at 122. Yang claims that after his arrest, officers punched and kicked him when they questioned him on three separate occasions. He required medical attention following the beatings and submitted supporting documents. He testified that his family paid 18,000 RMB to secure his release, although the documentation that he presented only stated a 5,000 RMB charge. Yang explained that this official receipt did not include additional fees paid.

After paying the fine, Yang was allowed to return to his village where he was detained yet again for a few days, this time by Family Planning officials who told him that he would not be allowed to leave until his wife submitted to a physical examination. Her pregnancy was discovered and she was forced to have an abortion. He was then released, and they decided that he should attempt to leave the country again. Yang purchased documents a final time for $50,000 and successfully left China on March 20, 2000 as a stowaway on a boat.

On or about March 30, 2001, Yang divorced his wife – allegedly for economic reasons. He testified that he met Lucy Hoang within six months of coming to this country at the restaurant where he worked. They married in April 2001. Thereafter, Hoang prepared an I-130 petition on Yang's behalf to adjust his status. The IJ found Yang ineligible to adjust status due to his entry into the United States as a stowaway, as Yang was in asylum-only proceedings.

5

The IJ noted Yang's alterations of testimony regarding the reason for divorce from his first wife, the inaccuracy of his son's birth date in Yang's application for asylum, Yang's confusing testimony regarding his arrest and various detentions in between Shen Zhen and his village, a lack of detail with regard to his wife's abortion, inconsistencies between his seaport interview and his testimony, and inconsistencies between his testimony and his documentary evidence. The IJ also relied upon a Country Conditions Report for China, which states that physical force is not authorized to make people submit to abortions or sterilizations, making Yang's testimony less plausible. App. at 359 (United States Dep't of State, China: Profile of Asylum Claims and Country Conditions (April 14, 1998)). Furthermore, the Country Conditions Report says that in the Fuzhou area, where Yang's village is located, the use of the IUD is urged only after the family's second or third child, whereas Yang testified that his wife was forced to wear an IUD and undergo an abortion after only their first child.

Yang calls to our attention inaccurate statements in the IJ's opinion. For example, the IJ mistakenly stated that Yang and his current wife met while working in the same restaurant, whereas the testimony was that she came in to the restaurant when he was working. The IJ also stated that Yang decided to divorce his first wife on January 1 or February 2, whereas the testimony only referred to January or February. Yang takes issue with the IJ's finding of a contradiction between the 18,000 RMB Yang allegedly paid and the 5,000 RMB receipt. However, the IJ was entitled to discredit Yang's explanation of

6

the differential. These discrepancies are too minor to be of issue.

However, other contradictions noted by the IJ are more telling. Yang testified he was released from detention in August 1999 after his (first) wife submitted to an abortion, but the documentary evidence showed that his wife had the abortion in September 1999. The September abortion is incompatible with his testimony that he was released from detention in August only after his wife's abortion. Similarly, when Yang was first questioned by United States officials at his time of entry, he stated he was coming here to earn a better living and made no reference to any problems he and his wife were having with the birth control officials. He admitted that he feared persecution upon return, but only because he had left China illegally. When asked why he did not tell the immigration officers about the family planning persecution, he replied non-responsively, "I saw their Mandarin speaker, and I was afraid, I was not sure what will happen to me if they send me back to China." App. at 136.

Yang urges this court to treat the seaport interview with caution. "In a number of opinions this court has declined to give much significance to discrepancies in statements made when the applicant has arrived at the point of entry." Xie v. Ashcroft, 359 F.3d 239, 246 (3d Cir. 2004). Yang cites Balasubramanrim, 143 F.3d at 162-63 as one such decision, but there are significant differences in the circumstances between Balasubramanrim and the instant case. In Balasubramanrim, the alien was interviewed in English without an interpreter, and the only record was a hand-written list of questions

and answers. We stated that "under the facts of this case, the [BIA] placed undue reliance on the airport interview." Balasubramanrim, 143 F.3d at 162 (emphasis added). In contrast, in the instant case the seaport statement was reliably recorded and Yang had an interpreter.

We did note in Xie that an interview with immigration officials could be intimidating, but also stated that "discrepancies [that] go to the heart of the claim" are difficult to ignore. Xie, 359 F.3d at 246. Yang's complete failure to mention the beatings, detentions, and operations under the family planning policies is such a discrepancy.

Although the IJ misstated the record on some immaterial facts, the IJ's adverse credibility finding is not so unreasonable that the record compels us to overturn it, given the major inconsistencies noted. In any event, we rely primarily on the second reason given by the IJ in denying asylum.

In its opinion, the IJ held that even if Yang's testimony were credible, Yang would still not prevail because:

> This Court would not expand the scope of the Matter of C-Y-Z, 21 [I. & N.] Dec. 915 to incorporate former spouses of individuals, who have come within the definition of refugee, to be considered refugees themselves

App. at 56-57. By amendment to the INA in 1966, the term "refugee" was expanded to include, inter alia, women who have been forced to abort a pregnancy or undergo a sterilization procedure. In Matter of C-Y-Z, the BIA held that an alien whose spouse was

8

forced to undergo an abortion or sterilization procedure can establish past persecution on account of political opinion and qualifies as a refugee under 8 U.S.C. § 1101(a)(42)).

Yang concedes that he is no longer married to the victim of the coerced abortion, but he argues that he suffered a real loss at the time of the abortion. He contends that, "this unborn child was as much [Yang's] as [Yang's] ex-wife's and, as such, he suffered as much persecution as his wife from the conduct of the Chinese government." Pet. Br. at 29. As much as we may empathize with Yang for his loss, this argument is insufficient to compel this court to overturn the IJ's ruling.

The IJ also held that Yang could not prevail because his divorce and subsequent remarriage to his second wife constituted a fundamental change under 8 C.F.R. § 208.13(b)(1)(i)(A). Insofar as his remarriage wholly nullifies a fear of future persecution by changing his personal circumstances and unfettering his ability to have a family, we have no reason to differ with the IJ's ruling.

**II.**

For the reasons set forth, we will deny the Petition for Review.