PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-3939 & 11-1998
_____

GEORGE HERMAN TOTIMEH,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent
_____

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge:  Honorable Walter A. Durling
(No. A024-396-784)
_____

Argued November 16, 2011

Before: McKEE, Chief Judge, RENDELL
and AMBRO, Circuit Judges

(Opinion filed: January 12, 2012)

Wayne P. Sachs, Esquire (Argued)
1518 Walnut Street, Suite 702
Philadelphia, PA   19102-0000

      Counsel for Petitioners

Eric H. Holder, Jr.
 Attorney General
Tony West
Assistant Attorney General, Civil Division
Stephen J. Flynn
 Assistant Director
Thomas W. Hussey, Esquire
Jeffrey R. Meyer, Esquire (Argued)
Benjamin Zeitlin, Esquire
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC  20044

      Counsel for Respondent

_____

OPINION  OF  THE  COURT

_____

AMBRO, <u>Circuit Judge</u>

George Totimeh, a native of Liberia, seeks relief from the order of an Immigration Judge ("IJ") that he be removed from the United States.  In these consolidated petitions for review, he seeks review of decisions by the Board of

Immigration Appeals ("BIA") declining to remand or reopen his case and dismissing his appeal.[1] We decide whether the BIA erred in holding that Totimeh's conviction under Minnesota's predatory offender registration statute was a crime involving moral turpitude for purposes of the Immigration and Nationality Act ("INA"). We also decide whether the BIA abused its discretion in not reopening his case to allow him to supplement the administrative record with evidence regarding when he first was admitted legally to the United States. We grant the petitions, reverse the BIA's holding regarding Totimeh's conviction under the predatory offender registration statute, and remand to the BIA with instructions to allow Totimeh to supplement the record to show that he was legally admitted to the United States in July 1980 and to enter an order that he is not removable under § 237(a)(2)(A)(i) of the INA. We thus vacate the order of removal.

## I.  Facts and Procedural History

Totimeh was inspected and admitted to the United States at New York City as a B-1 visitor in July 1980. Soon thereafter, he moved to Minnesota to attend a university, whereupon his status was changed to an F-1 student. On May 8, 1983, he was granted an adjustment of status to that of a lawful permanent resident.

In January 1988, Totimeh pled guilty to criminal sexual conduct in the fourth degree. In 1995, Minnesota enacted a predatory offender registration statute, Minn Stat.

_____

[1] Pursuant to 8 U.S.C. § 1252(b)(6), our review of Totimeh's petition for review of the BIA's denial of his motion to reopen his case was consolidated with our review of the underlying order of removal.

3

§ 243.166, which requires persons to register if convicted of criminal sexual conduct. Totimeh complied with the statute's requirements for approximately three years, until he moved to a friend's apartment without notifying the authorities of this change of address. In April 1998, he pled guilty to failing to comply with the statute's registration requirement.

On October 29, 2009, the Department of Homeland Security ("DHS") began removal proceedings against Totimeh by filing a Notice to Appear. The Notice stated that he was admitted to the United States on May 8, 1983. DHS alleged that Totimeh was removable pursuant to two provisions of the INA: (1) based on his 1988 conviction, he was removable under § 237(a)(2)(A)(i), 8 U.S.C. § 1227(a)(2)(A)(i), for having been convicted of a crime involving moral turpitude committed within five years after his "date of admission" and for which a sentence of one year or longer may be imposed; and (2) based on his 1998 conviction, coupled with his 1988 conviction, he was removable under § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii), for having been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct.

When Totimeh first appeared before the IJ, he conceded the factual allegations in the Notice to Appear, including that he was admitted to the United States in May 1983. He also conceded that his 1988 conviction was a crime involving moral turpitude, but denied that his 1998 conviction under Minnesota's predatory offender registration statute was an offense of moral turpitude.

In February 2010, the IJ issued an interlocutory ruling in connection with Totimeh's request for release from DHS

4

custody on bond,[2] finding that he was removable under both provisions of the INA cited by the DHS. Totimeh's admissions indicated that he was removable under § 237(a)(2)(A)(i) for being convicted of a crime of moral turpitude within five years of his admission to the United States. The IJ held as well that Totimeh's 1998 conviction was for a crime involving moral turpitude (and thus he also was removable under § 237(a)(2)(A)(ii)). The latter ruling relied on the BIA's decision in *In re Tobar-Lobo*, 24 I. & N. Dec. 143 (BIA 2007), whereby it concluded that failure to register as a sex offender in violation of California's sex offender registration act was a crime involving moral turpitude.

Several months later, Totimeh asserted for the first time that he was admitted to the United States in July 1980, not May 1983. Establishing the July 1980 admission would have nullified the ground for removing him that § 237(a)(2)(A)(i) of the INA provided based on his 1988 conviction. However, he did not support his assertion with any evidence in the record. Therefore, the IJ ruled that Totimeh had been admitted as a legal permanent resident in May 1983, continued to find him removable under §§ 237(a)(2)(A)(i) and (ii) of the INA, and ordered him removed to Liberia.

Totimeh appealed to the BIA. In affirming the IJ, it similarly relied on *Tobar-Lobo* to hold that Totimeh was removable under § 237(a)(2)(A)(ii). It also cited *In re Shanu*, 23 I. & N. Dec. 754 (BIA 2005), for its holding that the term "date of admission" includes an adjustment of status and that an adjustment of status qualifies as a "date of admission" under § 237(a)(2)(A)(i). Thus, per the BIA's reasoning, even

---

[2] Totimeh had been placed in DHS custody for a separate offense unrelated to the charges underlying his removability.

had Totimeh offered sufficient proof of his July 1980 admission, he still would have been removable under that subsection of the INA because his change in status to a permanent legal resident in May 1983 made that a date of admission as well.

After filing his petition for review of the BIA's decision, Totimeh filed a motion with the BIA to reopen his case so that he might supplement the record with documentary evidence obtained through a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.[3] This evidence established his July 1980 admission, showing that he was admitted on a B-1 visa on July 20, 1980, and that his status was changed to an F-1 student in December 1980, conditioned on his pursuing a full course of study and completing his studies no later than June 1984. The evidence further showed that, as of September 1982, Totimeh was not enrolled in a full course of study.

Before it ruled on the motion to reopen, the BIA decided *Matter of Alyazji*, 25 I. & N. Dec. 397 (BIA 2011), in which it amended its holding in *Shanu*, explaining that "date

---

[3] The documentary evidence that Totimeh obtained through his FOIA request was controlled by the Government, which necessarily possessed the information at the time that Totimeh first asserted to the IJ that he was admitted to the United States in July 1980. It is strange that the Government did not provide this information to Totimeh or the IJ at the time the former asserted his correct admission date, and instead forced him to seek out the documents through a FOIA request. This resulted in unnecessary delay, an additional written decision by the BIA, and an additional appeal to us. We expect that the Government will respond (and quickly) in the future with such information in similar circumstances.

of admission," as used in § 237(a)(2)(A)(i) of the INA, refers to the single "date of admission by virtue of which the alien was present in the United States when he [or she] committed [the] crime." *Id.* at 406. The BIA nonetheless found that the evidence regarding Totimeh's July 1980 admission was immaterial to his removability under § 237(a)(2)(A)(i) because his May 1983 adjustment of status was the single date of admission relevant to his 1988 conviction. Thus, though acknowledging *Alyazji* superseded *Shanu*, the BIA denied the motion to reopen.

Totimeh and the Government agree that we must decide whether violating Minnesota's predatory offender registration statute is a crime involving moral turpitude for purposes of § 237(a)(2)(A)(ii) of the INA. If it is not, we then must decide whether, pursuant to the BIA's decision in *Alyazji*, the five-year period "after the date of admission" for purposes of § 237(a)(2)(A)(i) of the INA should be calculated based on Totimeh's May 1983 adjustment of status to a lawful permanent resident or his earlier 1980 admission date.[4]

## II.    Jurisdiction and Standard of Review

The IJ has jurisdiction over Totimeh's removal proceedings under 8 U.S.C. § 1229a. The BIA had jurisdiction to review the IJ's decision under 8 U.S.C. § 1103. It had jurisdiction over the motion to reopen under 8 U.S.C. § 1229a(c)(7). We have jurisdiction under 8 U.S.C. § 1252 to review the BIA's final order of removal and denial of the motion to reopen.

---

[4] Totimeh initially argued that the BIA's holding in *Shanu* contravened the plain language of § 237(a)(2)(A)(i) of the INA. In light of the BIA's clarification of *Shanu* in *Alyazji*, both Totimeh and the Government agree that *Alyazji* controls, and neither party disputes the BIA's holding in that case.

Because the BIA rendered its own opinion regarding Totimeh's removability under the INA, we review the decision of the BIA and not the IJ. *Xie v. Ashcroft*, 359 F.3d 239, 240 (3d Cir. 2004). We review the BIA's conclusions of law *de novo*, "but will afford *Chevron* deference to the BIA's reasonable interpretations of statutes which it is charged with administering." *Luntungan v. Att'y Gen.*, 449 F.3d 551, 555 (3d Cir. 2006) (quoting *Kamara v. Att'y Gen.*, 420 F.3d 202, 211 (3d Cir. 2005)). The BIA's determination of whether a specific crime involves moral turpitude qualifies for *Chevron* deference. *Knapik v. Ashcroft*, 384 F.3d 84, 87 n.3 (3d Cir. 2004). Under *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), "[i]f congressional intent is clear from the statute's language, we must give effect to it as written." *Knapik*, 384 F.3d at 87. If a statute "is silent or ambiguous, we must decide if the agency's action is based on 'a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843). Except for its conclusions of law, we review the BIA's denial of the motion to reopen for abuse of discretion. *Luntungan*, 449 F.3d at 555.

## III. Crime Involving Moral Turpitude

Whether a conviction under a state law is a crime of moral turpitude calls for "a 'categorical' approach, 'focusing on the underlying criminal statute rather than the alien's specific act.'" *Jean-Louis v. Att'y Gen.*, 582 F.3d 462, 465 (3d Cir. 2009) (quoting *Knapik*, 384 F.3d at 88). We consider "what the convicting court must necessarily have found to support the conviction and not [] other conduct in which the defendant may have engaged in connection with the offense." *Wilson v. Ashcroft*, 350 F.3d 377, 381-82 (3d Cir. 2003) (quoting *Steele v. Blackman*, 236 F.3d 130, 135 (3d Cir. 2001)).

8

The BIA has defined "moral turpitude" as "conduct that is inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed other persons, either individually or to society in general." *Knapik*, 384 F.3d at 89. "[I]t is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude." *Matter of Flores*, 17 I. & N. Dec. 225, 227 (BIA 1980). Moral turpitude also may "inhere in serious crimes committed recklessly, i.e., with a conscious disregard of a substantial and unjustifiable risk that serious injury or death would follow." *Partyka v. Att'y Gen.*, 417 F.3d 408, 414 (3d Cir. 2005). *See also Knapik*, 384 F.3d at 90 (deferring to the BIA's determination that reckless endangerment is a crime involving moral turpitude); *Matter of Medina*, 15 I. & N. Dec. 611, 613 (BIA 1976) (concluding "that moral turpitude can lie in criminally reckless conduct"). We thus have stated that "[t]he 'hallmark' of moral turpitude [is] 'a reprehensible act with an appreciable level of consciousness or deliberation.'" *Mehboob v. Att'y Gen.*, 549 F.3d 272, 276 (3d Cir. 2008) (quoting *Partyka*, 417 F.3d at 414).

The Minnesota predatory offender registration statute that Totimeh violated defined the offense as "knowingly violat[ing] any of [the statute's] provisions or intentionally provid[ing] false information." Minn. Stat. § 243.166.5 (1998).[5] The statute required persons to register by providing

---

[5] All references to the statute reflect how it read when Totimeh was convicted under it in April 1998. It currently provides that "[a] person required to register under [the statute] who knowingly violates any of its provisions or intentionally provides false information . . . is guilty of a felony and may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both." Minn. Stat. § 243.166.5(a) (2011). In

a signed statement "giving information required by the bureau of criminal apprehension," a fingerprint card, and a photograph. *Id.* at § 243.166.4(a). The statute also required registered offenders to provide a written notice of a change in residence at least five days before changing residence. *Id.* at § 243.166.3(b).[6]

The BIA concluded that a conviction under Minnesota's registration statute was a crime of moral turpitude by relying on its decision in *Tobar-Lobo*, 24 I. & N. Dec. at 143, regarding offenses under California's similar registration statute. The majority of a split BIA panel focused on the California statute's purpose of sheltering citizens from dangerous sex offenders: "Given the serious risk involved in a violation of the duty owed by this class of offenders to society, we find that the crime [of willfully violating any of the statute's requirements] is inherently base or vile and therefore meets the criteria for a crime involving moral turpitude." *Id.* at 146. The dissent objected that the statute swept so broadly as to convict individuals for reasons not involving "evil intent or a corrupt mind," creating a regulatory offense traditionally viewed as lacking the depravity necessary for moral turpitude. *Id.* at 148. But the

_____

1998, the statute provided that an offense under it was a gross misdemeanor, unless the offender previously had been convicted under the statute, in which case the additional offense was a felony. Minn. Stat. § 243.166.5 (1998).

[6] The statute currently sets out a detailed list of information an offender must provide. Minn. Stat. § 243.166.4a(a) (2011). It further provides that the person must immediately inform the proper authorities if any of this information is no longer valid because of a change in circumstances. *Id.* at § 243.166.4a(b).

majority reasoned that "[s]ome obligations, once imparted by proper notification, are simply too important not to heed. That is, even if 'forgotten,' an offense based on a failure to fulfill the offender's duty to register contravenes social mores to such an extent that it is appropriately deemed turpitudinous." *Id.* at 146–47.

Federal Courts of Appeals have criticized the BIA's conclusion in *Tobar-Lobo*. *See Efagene v. Holder*, 642 F.3d 918 (10th Cir. 2011); *Plasencia-Ayala v. Mukasey*, 516 F.3d 738 (9th Cir. 2008), *overruled on other grounds by Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009). In the most recent case — *Efagene*, holding that a conviction under Colorado's similar registration statute is not a crime involving moral turpitude — the Tenth Circuit Court explained that the BIA's reasoning so departs from longstanding precedent of what constitutes moral turpitude as to render the BIA's interpretation unreasonable even under *Chevron* deference. 642 F.3d at 922-25. The Court noted that the BIA relied on cases holding that offenses of rape, child abuse, and spousal abuse are crimes of moral turpitude. They involve intentional conduct, identifiable victims and actual harm, and are deemed wrong by society independent of any statutory prohibition. It contrasted those crime types with regulatory offenses—such as filing, reporting, and licensing requirements—which historically have been held not to involve moral turpitude. *Id.* at 922-23 (reviewing BIA and Courts of Appeals' decisions that various regulatory offenses are not crimes involving moral turpitude). Similar to these regulatory offenses, the Colorado statute prohibited conduct that society deemed wrong only because it required that certain actions be taken, not because, "as a categorical matter, [it] involve[d] an identifiable victim, any actual harm, or any intent to cause harm." *Id.* at 922. The result was that, under longstanding BIA precedent, violating the Colorado regulatory statute did not qualify as a crime of moral

turpitude, and the BIA's contrary decision was not entitled to deference.

Moreover, *Efagene* further underscored the unreasonableness of the BIA's interpretation of moral turpitude in *Tobar-Lobo* by noting that "the rationale for the decision could apply to any and every criminal infraction." 642 F.3d at 925. "Were moral turpitude to reach any breach of duty to society, or the failure to meet any obligation 'too important not to heed,' the words 'moral turpitude' would be rendered superfluous and a noncitizen would be removable if convicted of 'two or more crimes' of any kind." *Id.*

We join this path of analysis. First, based on how Minnesota's courts apply it, the statute prescribes an offense that can be committed without intent, indeed simply by forgetfulness. *State v. Dekraai*, 2008 WL 72829, at *3 (Minn. Ct. App. Jan. 8, 2008) ("It is a status crime because you do not have to do anything wrong to be guilty of it . . . ."); *State v. Delapaz*, 2007 WL 1976668, at *6 (Minn. Ct. App. July 10, 2007) ("The evidence . . . showed that appellant knew he was required to register within five days of his move, and his reasons for failing to register did not excuse him."). Moreover, Minnesota's courts have described the statute as regulatory and designed to assist law enforcement. *See, e.g.*, *State v. Lopez*, 778 N.W.2d 700, 704 (Minn. 2010) ("[T]he primary purpose of [Minn. Stat. § 243.166] is to create an offender registry to assist law enforcement with investigations.") (quoting *Boutin v. LaFleur*, 591 N.W.2d 711, 717 (Minn. 1999)).

Second, the statute does not regulate a crime that of itself is inherently vile or intentionally malicious. Sexual assault, child abuse, and spousal abuse are no doubt inherently vile and elicit strong outrage. But this outrage is directed at the underlying crimes that resulted in the passage

of offender registration statutes such as that in Minnesota; the independent act of failing to register or update a registration as a predatory offender is not, as a category of crime, an inherently despicable act.

In addition to the Minnesota statute bearing neither of the traditional hallmarks of a crime involving moral turpitude, evil intent or a vile act, the BIA's interpretation of that statute also contradicts its precedent of what constitutes a crime involving moral turpitude under the INA. *See, e.g., In re Abreu-Semino*, 12 I. & N. Dec. 775, 776 (BIA 1968) ("We have many times held that the violation of a regulatory, or licensing, . . . provision of a statute is not a crime involving moral turpitude."). "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).

In this context, the BIA's determination that Minnesota's predatory offender registration statute is a crime involving moral turpitude as a categorical matter for purposes of the INA is wrong as a matter of law and is not entitled to *Chevron* deference.[7] The BIA and IJ thus erred in holding

---

[7] Totimeh urges that if we determine that the portion of Minnesota's predatory offender registration statute that prescribes the "intentional" provision of "false information" yields a different result in terms of the moral turpitude analysis, we should examine his conviction under our modified categorical approach. We employ this approach when a statute contains disjunctive elements, some of which are morally turpitudinous and others of which are not. *Jean-Louis*, 582 F.3d at 466. In these instances, the statute is

13

that Totimeh is removable under § 237(a)(2)(A)(ii) of the INA.

## IV. Date of Admission

Totimeh still may be removable under § 237(a)(2)(A)(i) of the INA based on his 1988 conviction, which clearly was a crime involving moral turpitude, if the BIA was correct in using his May 1983 adjustment of status as a "date of admission." To repeat, it relied on *Shanu*, 23 I. & N. Dec. at 754, in which it held that the term "admission" includes an adjustment of status, and that every date of admission qualifies as a potentially relevant date for purposes of § 237(a)(2)(A)(i).

But *Alyazji*, 25 I. & N. Dec. at 397, undermines *Shanu* by explaining that date of admission "refers to a *single* date in relation to the pertinent offense . . . ." *Id.* at 405 (emphasis in original). This "single date" is "the date of the admission by virtue of which the alien was present in the United States when he [or she] committed [the] crime." *Id.* at 406. The

---

"divisible," and we examine the record of conviction to determine under which part of the statute the petitioner was convicted. *Partyka*, 417 F.3d at 411–12.

The conviction record does not specify whether Totimeh was convicted for "knowingly violat[ing]" the statute or for "intentionally provid[ing] false information." Minn. Stat. § 243.166.5 (1998). Under these circumstances, we analyze the offense under "the sub-section requiring the least culpability," *Mehboob*, 549 F.3d at 275, which, per the Minnesota statute, is the "knowingly violates" prong. For the reasons noted above, a conviction under that prong is not a crime of moral turpitude.

14

BIA established the following test to determine removability in connection with a date of admission:

> [T]o ascertain an alien's deportability under [§ 237(a)(2)(A)(i) of the INA], we look first to the date when his crime was committed. If, on that date, the alien was in the United States pursuant to an admission that occurred within the prior 5-year period, then he is deportable. Conversely, the alien is not deportable if he committed his offense more than 5 years after the date of the admission pursuant to which he was then in the United States. Moreover, under this understanding of the phrase "the date of admission," *the 5-year clock is not reset by a new admission from within the United States (through adjustment of status). Rather, such a new admission merely extends an existing period of presence that was sufficient in and of itself to support the alien's susceptibility to the grounds of deportability*.

*Id.* at 406–07 (emphasis added in part). Stated simply, once an alien is in the United States legally, the five-year clock starts. Later adjustment of the reason that the alien may stay does not restart a clock that never stopped.

For example, the petitioner in *Alyazji* was admitted to the United States as a nonimmigrant in 2001. He remained in this country thereafter, and in 2006 his status was adjusted to that of a lawful permanent resident. In 2008, he was convicted of indecent assault. The BIA held that he was not convicted of the offense within five years of his "date of admission" because his 2006 adjustment of status "added nothing to the deportability inquiry; it may have *extended* or reauthorized his then-existing presence, but it did not change

15

his status vis-à-vis the grounds of deportability." *Id.* at 408 (emphasis in original). The BIA noted as well that an overstay or other violation of nonimmigrant status would not change the outcome if the person entered the United States legally: "We now make clear that such an overstay or violation would have *no effect* on our analysis under [§ 237(a)(2)(A)(i)]." *Id.* at 407 n.8 (emphasis in original). It contrasted this with the outcome if the petitioner had entered the United States without inspection (that is, illegally), and then adjusted his status in 2006: "In *that* case, the date of adjustment would have triggered the running of the 5-year clock because it would have commenced (rather than extended) the respondent's then-current period of presence in the United States following an admission." *Id.* at 408 n.9 (emphasis in original).

Despite this unequivocal holding that is directly applicable to Totimeh's situation, the BIA surprisingly found him removable under § 237(a)(2)(A)(i) because he was not "readmitted," but was present in the United States pursuant to his May 1983 adjustment in status. Erroneously citing the BIA's statement regarding initial entry without inspection, the Government argues that the BIA's application of *Alyazji* is correct because Totimeh was "out of status" as of September 8, 1982, given that he was not enrolled in a full course of study at that time, and thus his May 1983 adjustment of status "commenced" his presence in the United States.

But based on the BIA's explicit holding in *Alyazji*, regardless whether Totimeh was "out of status," his 1980 admission was valid, and he remained in the United States through his adjustment of status in May 1983. His date of admission did not stop and restart then. The BIA thus misapplied its unambiguous precedent in *Alyazji* by holding that evidence of Totimeh's 1980 admission is immaterial to the § 237(a)(2)(A)(i) analysis. Moreover, as the Government

16

implicitly acknowledges, the evidence demonstrates that Totimeh was inspected and admitted legally in July 1980. Because his 1988 conviction for criminal sexual conduct in the fourth degree was more than five years after this date of admission, he is not removable under § 237(a)(2)(A)(i) of INA.

## V.    Conclusion

For these reasons, we grant Totimeh's petitions for review, reverse the BIA's holding that he is removable under § 237(a)(2)(A)(ii) of the INA, vacate the order of removal, and remand to the BIA with instructions to reopen the case to allow Totimeh to supplement the record and to enter an order that Totimeh is not removable under § 237(a)(2)(A)(i) of the INA.