**Lyonel JEAN–LOUIS, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES of America, Respondent.**

No. 07–3311.

United States Court of Appeals, Third Circuit.

Argued Feb. 5, 2009.

Filed: Oct. 6, 2009.

---

Craig R. Shagin, Esq., [Argued], The Shagin Law Group, Harrisburg, PA, for Petitioner.

Kevin J. Conway, Esq., [Argued], Richard M. Evans, Esq., Brooke M. Maurer, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: RENDELL and ROTH, Circuit Judges and HAYDEN, District Judge.*

* Honorable Katharine S. Hayden, Judge of the United States District Court for the District of New Jersey (Newark), sitting by designation.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

We are called upon to decide whether simple assault under Pennsylvania law, where the victim is under 12 years of age and the assailant is over 20 years of age, is a crime involving moral turpitude for purposes of cancellation of removal. In doing so we must address a recent opinion of the Attorney General that adopts a novel framework for determining whether a petitioner has been convicted of a crime involving moral turpitude ("CIMT"). We conclude that the petitioner was not convicted of a CIMT, and that we will apply our established methodology for analyzing CIMT, rather than the approach recently adopted by the Attorney General.

## I. Background and Procedural History

Appellant Lyonel Jean–Louis, a native and citizen of Haiti, was admitted to the United States in 1994 as a refugee, and became a lawful permanent resident in 1996. In 2001, Jean–Louis pled guilty to committing simple assault against a child under twelve years of age, in violation of 18 Pa. Cons.Stat. §§ 2701(b)(2).[1] The Department of Homeland Security ("DHS") subsequently filed a Notice to Appear ("NTA"), charging Jean–Louis as removable under the Immigration and Nationality Act ("INA") § 237(a)(2)(E)(I). Jean–Louis conceded removability but sought to cancel his removal under INA § 240(A)(a), 8 U.S.C. § 1229b(a).

Under the INA, discretionary cancellation of removal is available to an alien who has resided continuously in the United States for seven years. INA § 240A(a)(2), 8 U.S.C. § 1229b(a)(2). An alien's period of continuous residency terminates, however, if he "commits an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2)." INA § 240A(d)(1), 8 U.S.C. § 1229b(d)(1).[2] Crimes involving moral turpitude are among the offenses listed in 8 U.S.C. § 1182(a)(2)(A)(i)(I). Prior to his seventh year of residency in the U.S., Jean–Louis struck his wife's daughter, who was under the age of 12, to discipline her and was subsequently convicted of the Pennsylvania crime of simple assault, 18 Pa.C.S. § 2701(b)(2). The Immigration Judge ("IJ") concluded, and the Board of Immigration Appeals ("BIA") affirmed, that Jean–Louis's conviction for simple assault of a child under 12 years of age under subpart 2701(b)(2) constituted a CIMT, rendering Jean–Louis ineligible for cancellation of removal.

The Pennsylvania simple assault statute to which Jean–Louis pled guilty provides in pertinent part:

**(a) Offense defined.**—A person is guilty of assault if he:

(1) attempts to cause or *intentionally, knowingly or recklessly* causes bodily injury to another;

(2) negligently causes bodily injury to another with a deadly weapon; or

(3) attempts by physical menace to put another in fear of imminent serious bodily injury.

---

1. Jean–Louis pled guilty to simple assault in violation of 18 Pa.C.S. § 2701(b)(2) on July 25, 2001. The Pennsylvania simple assault statute was amended on June 22, 2001 (effective in 60 days), P.L. 605, No. 48, § 1, and again on Dec. 9, 2002 (effective in 60 days), P.L. 1391, No. 172, § 1. Neither amendment altered subpart 2701(b)(2).

2. An alien bears the burden of establishing his eligibility for discretionary cancellation of removal. INA § 240(c)(4)(A)(i), 8 U.S.C. § 1229a(c)(4)(A)(i).

**(b) Grading.**—Simple assault is a misdemeanor of the second degree unless committed:

. . .

(2) against a child under 12 years of age by an adult 21 years of age or older, in which case it is a misdemeanor of the first degree.

18 Pa.C.S. § 2701 (emphasis added). Noting that, "[I]t is unclear from the record of conviction whether the assault Respondent committed was intentional, knowing, or reckless," the IJ assumed that Jean–Louis "recklessly" inflicted bodily injury on another—the least culpable mental state specified in § 2701(a)(1). A. 113. Confining her analysis to that subpart of the statute, the IJ did not address whether there was a culpability requirement under subpart 2701(b)(2). Accordingly, the IJ did not consider whether subpart 2701(b)(2) required the defendant to have known of the underage status of the victim, or would apply in a situation in which the defendant was not aware, and had no reason to believe, that the victim was a minor. Instead, the IJ reasoned that because the victim was under 12 years old, the offense was a CIMT: "While the Court is cognizant of the fact that simple assault is generally not considered to be a CIMT, simple assault plus an aggravating factor is a CIMT." A. 112 (internal citation omitted). The IJ cited as authority for this proposition BIA opinions involving assaults that were "aggravated" by other types of factors; specifically, they were committed with a deadly weapon, committed against a law enforcement officer, or resulted in the victim's death. A. 112–13. Accordingly, the IJ concluded that Jean–Louis's conviction of simple assault under subpart 2701(b)(2) constituted a CIMT, rendering Jean–Louis ineligible for cancellation of removal. The BIA affirmed.[3]

## II. Discussion

■ On appeal, Jean–Louis contends that he is eligible for discretionary cancellation of removal because his conviction of simple assault does not qualify as a CIMT.[4] Crimes involving moral turpitude have been held to require conduct that is "inherently base, vile, or depraved." *Knapik v. Ashcroft,* 384 F.3d 84, 89 (3d Cir. 2004) (internal citations omitted). In determining whether a state law conviction constitutes a CIMT, the agency, and we, have historically applied a "categorical" approach, "focusing on the underlying criminal statute 'rather than the alien's specific act.'" *Id.* at 88 (quoting *DeLeon–Reynoso v. Ashcroft,* 293 F.3d 633, 635 (3d Cir.2002)). We thus "look to the elements of the statutory state offense, not to the specific facts," reading the applicable statute to ascertain the least culpable conduct necessary to sustain conviction under the

---

**3.** Because the BIA issued a summary affirmance, we analyze the IJ's decision. *See Dia v. Ashcroft,* 353 F.3d 228, 245 (3d Cir.2003) (en banc).

**4.** We summarily dispose of two other issues urged by Jean–Louis on appeal. First, Jean–Louis contends that his rights under INA § 239(a)(1)(C) & (D) and the Due Process Clause of the U.S. Constitution were violated, because his Notice to Appear failed to alert him to the CIMT issue. Jean–Louis's constitutional claim fails at the outset, because an alien seeking discretionary relief from removal has no cognizable liberty or property inter-

est. *See Hernandez v. Gonzales,* 437 F.3d 341, 345–46 (3d Cir.2006). Moreover, any such failure was harmless, as Jean–Louis was adequately apprised of the issue, having "prepared a brief on the topic [CIMT] in anticipation of the objection." Appellant's Br. at 6; A. 132–33, 210.

Jean–Louis's second argument is that he is entitled to a remand of his case to the IJ to have his claim for withholding of removal decided. However, to date, Jean–Louis has not filed—or sought leave to file—an application for withholding of removal, despite ample opportunity to do so.

statute. *Id.* (quoting *Wilson v. Ashcroft,* 350 F.3d 377, 381 (3d Cir.2003)).

Where a statute of conviction contains disjunctive elements, some of which are sufficient for conviction of the federal offense and others of which are not, we have departed from a strict categorical approach. In such a case, we have conducted a limited factual inquiry, examining the record of conviction for the narrow purpose of determining the specific subpart under which the defendant was convicted. *See Singh v. Ashcroft,* 383 F.3d 144, 162 (3d Cir.2004).[5] We have applied this "modified" categorical approach, even when clear sectional divisions do not delineate the statutory variations, *see Garcia v. Att'y Gen.,* 462 F.3d 287, 293 n. 9 (3d Cir.2006), in order to determine the least culpable conduct sufficient for conviction, and, where a CIMT is asserted, measure that conduct for depravity.

■ Here, the IJ, applying this methodology, concluded that the reckless infliction of bodily injury constituted the least culpable mental state sufficient for conviction under *subpart 2701(a)(1).* Significantly, however, the IJ did not consider the state of mind required under *subpart 2701(b)(2)* as to the child's age. It could be read to require that the offender knew of the age of the victim, or that the grading factor applies if the victim was under 12, whether or not the defendant knew of her age. Although we defer to the agency's deter-

mination of whether an offense constitutes a CIMT, we accord no deference to its construction of a state criminal statute, as to which it has no particular expertise. *See Knapik,* 384 F.3d at 88. Here, the determination of the *scienter* or level of culpability under subpart (b)(2) of the Pennsylvania assault statute is important, for the BIA itself has drawn a distinction for purposes of deciding whether an offense is a CIMT based on this very aspect of culpability, as we discuss below. We thus disagree with the IJ's reasoning that the age of the victim should be considered an "aggravating factor," and conclude that a more thorough analysis of the Pennsylvania criminal statute is in order.

Because the parties did not address the minimum culpability required under subpart 2701(b)(2), we requested further briefing. In his supplemental brief, Jean–Louis urges the Court to construe subpart 2701(b)(2) as written—it does not expressly prescribe a mental state requirement, and thus none applies. The government cites evidence consistent with Jean–Louis's interpretation of the statute, including the Pennsylvania suggested jury instructions and accompanying Advisory Committee Note, neither of which requires that a jury find that the defendant knew, or should have known, that the victim was under 12.[6] The government also specifically notes that subpart 2701(b)(2) is a grading factor, not an element of the substantive offense.[7]

5. In *Shepard v. United States,* the Supreme Court opined that the record of conviction includes the charging document, the plea agreement or transcript of the plea colloquy in which the defendant confirmed the factual basis for the plea, or a comparable judicial record of information. 544 U.S. 13, 26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).

6. The Advisory Committee Note to the Pennsylvania Suggested Standard Criminal Jury Instructions for § 2701(b)(2) is silent on the applicable mental state requirement: "Crimes Code § 2701(b)(2) raises simple assault from

a misdemeanor of the second degree to a misdemeanor of the first degree where the victim was under the age of 12 and the defendant was an adult 21 years of age or older." *See* Pa. SSJI (Crim), 15.2701G (simple assault—child victim).

7. The government states, "The subsection under which Mr. Jean–Louis was convicted is referred to in the statute as a 'grading factor.' According to Pennsylvania case law, 'the grading of the offense is not an element thereof.' " *Respondent's Supplemental Br. at 3.*

These aspects of the statute actually support Jean–Louis's position.

Quite apart from the government's concessions, we independently conclude that no culpability requirement attaches, explicitly or implicitly, to subpart 2701(b)(2). Unlike subpart 2701(a)(1), which expressly requires that the defendant intentionally, knowingly, or recklessly inflict bodily injury, subpart 2701(b)(2) does not specify the minimum culpability required to trigger enhanced penalties. Nor is such a requirement implicit in the statute. The determination that subpart 2701(b)(2) sets forth a grading factor and not an element of the offense is significant. As a "grading" factor, subpart 2701(b)(2) does not trigger the statutory "gap-filling" provisions,[8] which provide a mental state requirement that would be otherwise missing from "elements" of an offense. *See* 18 Pa.C.S. § 103 (defining "element[s] of an offense" as "conduct or attendant circumstances ... included in the description of the forbidden conduct in the *definition of the offense*") (emphasis added); *Commonwealth v. Shamberger,* 788 A.2d 408, 418 (Pa.Super.2001) (distinguishing "grading" factors from the elements of an offense); *accord Commonwealth v. Passarelli,* 789 A.2d 708, 714 (Pa.Super.2001); *Commonwealth v. Kisner,* 736 A.2d 672, 674 (Pa.Super.1999). The explicit designation of subpart 2701(b)(2) as a "grading" factor is particularly strong evidence of the legislative intent here, as the distinction between "grading" factors and "elements" of an offense was already established in Pennsylvania jurisprudence when subpart 2701(b)(2) was added in 1988. P.L. 1275, No. 158, § 1 (Dec. 19, 1988); *see, e.g., Commonwealth v. Sparks,* 342 Pa.Super. 202, 492 A.2d 720, 725 (1985); *Commonwealth v. Mathis,* 317 Pa.Super. 226, 463 A.2d 1167, 1170 (1983); *Commonwealth v. Stauffer,* 239 Pa.Super. 463, 361 A.2d 383, 384 (1976); *Commonwealth v. McKennion,* 235 Pa.Super. 160, 340 A.2d 889, 892 (Pa.Super.1975).[9]

A recent decision of the New Hampshire Supreme Court supports the proposition that the Pennsylvania gap-filling provisions are inapplicable to subpart 2701(b)(2). In *State v. McCabe,* 145 N.H. 686, 765 A.2d 176, 180–81 (2001), the Court considered what mental state requirement,

---

**8.** 18 Pa.C.S. § 302(c) defines the requisite mental state when the statute is silent on the culpability applicable to a material element of an offense. It provides:

**Culpability required unless otherwise provided.**—When the culpability sufficient to establish a *material element* of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly, or recklessly with respect thereto.

*Id.* (emphasis added).

18 Pa.C.S. § 302(d), which serves a slightly different function than § 302(c), defines the requisite mental state when the statute defines the culpability sufficient for *some,* but not *all,* material elements of an offense. It provides:

**Prescribed culpability requirement applies to all material elements.**—When the law defining an offense prescribes the kind of culpability that is sufficient for commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the *material elements* of the offense, unless a contrary purpose plainly appears.

*Id.* (emphasis added).

**9.** Moreover, the designation of subpart 2701(b)(2) as a "grading" factor has survived subsequent revisions of the simple assault statute. 18 Pa.C.S. § 2701 (amended in 2001, June 22, P.L. 605, No. 48, § 1; 2002, Dec. 9, P.L. 1391, No. 172, § 1). We presume that the legislature is "aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Hence, we cannot conclude that the legislature intended a culpability requirement to inhere in subpart 2701(b)(2) when it adopted and retained language achieving precisely the opposite result.

if any, attached to conduct—"use of a deadly weapon"—that appeared in the *penalty* section of the offense of "criminal threatening." The statute did not specify a mental state requirement. *Id.* at 180. The Court concluded that the New Hampshire gap-filling provision, applicable solely to material elements of an offense, did not govern, because "[t]he only statutory reference to the use of a deadly weapon is contained in the penalty section" of the statute, and the gap-filling provision applies solely to *elements* of an offense, not to grading factors. *Id.* at 180–81; *see State v. Polk,* 155 N.H. 585, 927 A.2d 514, 516–17 (2007) (holding that gap-filling provision did not apply to conduct solely affecting grading of an offense); *see also State v. Demmons,* 137 N.H. 716, 634 A.2d 998, 1000 (1993) (noting that culpability requirement is only implied for material elements of an offense).

■ Thus, we conclude that the Pennsylvania assault statute as written permits a conviction under subpart 2701(b)(2) where the defendant did not know that the victim was under 12 years old. This key fact distinguishes this case from the statute we considered in *Partyka v. Att'y Gen.,* 417 F.3d 408, 413 (3d Cir.2005). There, we had to determine the minimum culpability required for conviction of the offense of "aggravated assault," defined under New Jersey law as the commission of simple assault against "[a]ny law enforcement officer acting in the performance of his duties while in uniform or exhibiting evidence of his authority." N.J. Stat. Ann. § 2C:12–1b(5)(a) (West 1995 & Supp.2004). Concluding that commission of an assault against a law enforcement officer was a material element of the offense of aggravated assault, we cited *United States v. Rebelo,* 358 F.Supp.2d 400, 418–19 (D.N.J. 2005), which applied the New Jersey gap-filling provision, and held that the offender had to have known that the victim was a police officer. *Partyka,* 417 F.3d at 413.

Crucial to our analysis—and to the analysis in *Rebelo* upon which we relied—was the fact that the relevant conduct appeared in the *definition* of the offense of aggravated assault and thus was an element thereof. *Id.* (citing *Rebelo,* 358 F.Supp.2d at 418–19). Because the offender had to know that the victim was an officer, the offense reflected the requisite degree of depravity and thus constituted a CIMT. Here, by contrast, the age of the perpetrator and victim are specified *not* in the definition of the offense *but rather* under the separate statutory heading, "grading." Regardless of how New Jersey law treats "grading" factors, their status under Pennsylvania law is clear. Where the conduct is included under a statutory section entitled, "grading," rather than under the "definition" of the offense, the conduct is *per se* not an "element" of the offense. *See* 18 Pa.C.S. § 103 (defining the "elements" of an offense as solely conduct included in the formal definition of the offense). Accordingly, the Pennsylvania gap-filling provisions—that would ordinarily mandate a specific mental state with respect to the victim's age—do not apply to subpart 2701(b)(2), and there is no culpability requirement as to that subpart.

Based upon the foregoing analysis, we conclude that the least culpable conduct necessary for conviction under subpart 2701(b)(2) would be a reckless assault by a person over 20 years of age, where the victim, unbeknownst to the defendant, is under 12 years of age. One example might be where a reckless driver strikes a vehicle bearing a child occupant. Such a scenario does not appear to us to implicate "moral turpitude," as that concept has been viewed by the agency and developed under our precedents. The BIA has observed that "[s]imple assaults have generally been held *not to involve moral turpitude.*" *Matter of O——,* 3 I. & N. Dec. 193, 194 (BIA 1948). It has repeatedly opined

that the hallmark of a CIMT, indeed, is an act "accompanied by a vicious motive or a corrupt mind." *Matter of Perez–Contreras*, 20 I. & N. Dec. 615, 618 (BIA 1992); *see Matter of Khourn*, 21 I. & N. Dec. 1041, 1046 (BIA 1997); *Matter of Franklin*, 20 I. & N. Dec. 867, 868 (BIA 1994); *Matter of Flores*, 17 I. & N. Dec. 225, 227 (BIA 1980) ("An evil or malicious intent is said to be the essence of moral turpitude."); *Matter of Abreu–Semino*, 12 I. & N. Dec. 775, 777 (BIA 1968) (noting that "moral turpitude normally inheres in the intent"); *Matter of P——*, 2 I. & N. Dec. 117, 121 (BIA 1944) ("One of the criteria adopted to ascertain whether a particular crime involves moral turpitude is that it be accompanied by a vicious motive or corrupt mind. 'It is in the intent that moral turpitude inheres.' ") (quoting *US ex rel. Meyer v. Day*, 54 F.2d 336, 337 (2d Cir. 1931)). Courts of appeals have followed suit. In *Michel v. INS*, the Court of Appeals for the Second Circuit thus identified a "corrupt *scienter* " as the "touchstone of moral turpitude." 206 F.3d 253, 263 (2d Cir.2000); *see Chanmouny v. Ashcroft*, 376 F.3d 810, 814–15 (8th Cir.2004); *Hamdan v. INS*, 98 F.3d 183, 186 (5th Cir.1996). And, in *Partyka*, the statute required that the defendant know the victim was a police officer. 417 F.3d at 413. Such depravity, however, is absent when a defendant could be convicted for unwittingly injuring a child—an act that, in our view, reflects a degree of malice no greater than that exhibited by an assault recklessly committed against an adult.

We normally defer to the agency as to what conduct constitutes a CIMT. Our view that reckless assault of a minor, without more, does not constitute a CIMT is bolstered by a recent decision of the Attorney General, *Matter of Cristoval Silva–Trevino*, 24 I. & N. Dec. 687, 706–708 (2008). There, the Attorney General considered whether a statute criminalizing intentional sexual acts directed at a child constituted a CIMT. The statute did not include a mistake-of-age defense. Hence, a defendant who did not know, and had no reason to believe, that the complainant was a minor could face conviction. The Attorney General concluded, therefore, that the statute lacked the "hallmark of moral turpitude"—a "reprehensible act committed with an appreciable level of consciousness or deliberation." *Id.* at 706 (quoting *Partyka*, 417 F.3d at 414). Significantly, the Attorney General stated, "[W]hether the perpetrator knew or should have known the victim's age is a critical factor in determining whether his or her crime involved moral turpitude for immigration purposes. A finding of moral turpitude under the Act requires that a perpetrator have committed the reprehensible act with some form of scienter." *Id.* Thus, in *Silva–Trevino*, the Attorney General treated the perpetrator's knowledge regarding the victim's age as a critical consideration informing the depravity of the crime. As we noted above, the IJ here did not consider the culpability required under subpart 2701(b)(2) but merely stated that it was an "aggravating factor," which converted simple assault into a CIMT, relying on case law that did not involve age as a factor. However, our conclusion that subpart 2701(b)(2) has no mental state requirement, coupled with the Attorney General's stated view in *Silva–Trevino* that a defendant's knowledge regarding the age of his victim may properly bear on the depravity of his conduct, leads inexorably to the conclusion that the Pennsylvania crime of which Jean–Louis was convicted was not a CIMT. While we would normally remand to the agency for a "decision of a matter that statutes place primarily in agency hands"—namely, the determination of whether a criminal violation constitutes a CIMT—the agency has spoken clearly that *scienter* as to age is critical to the CIMT inquiry, and that the absence of a *scienter* requirement is conclusive. *See INS v.*

*Ventura,* 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002); *Matter of O——,* 3 I. & N. Dec. at 194 (holding that simple assault does not constitute a CIMT).[10]

■ The foregoing analysis tracks the modified categorical approach that we have historically applied. Under that approach, *our inquiry concludes when we determine whether the least culpable conduct sufficient to sustain conviction under the statute "fits" within the requirements of a CIMT.* However, in the recent opinion we cited above, *Matter of Cristoval Silva–Trevino,* the Attorney General suggested that more is required. We asked the parties to brief two related issues: the effect of *Silva–Trevino* on our existing methodology, and our duty to follow *Silva–Trevino,* notwithstanding our contrary precedents.

We conclude that deference is not owed to *Silva–Trevino's* novel approach and thus will apply our established methodology.

In *Silva–Trevino,* as discussed earlier, the Attorney General considered whether an alien's conviction for indecency with a child under Texas law constituted a CIMT, rendering the alien inadmissible, and therefore ineligible for discretionary cancellation of removal, under section 212(a)(2) of the INA, 8 U.S.C. § 1182(a)(2). The Attorney General urged that because conflicting methodologies had been adopted by courts of appeals in conducting the CIMT inquiry, producing a veritable "patchwork of different approaches across the nation," he would use the case as "an opportunity to establish a uniform framework" for adjudicating CIMT cases under the INA.[11] *Id.* at 688. The Attorney Gen-

10. We note that a BIA decision that the government urges should control the analysis here is distinguishable. In *Matter of Tran,* 21 I. & N. Dec. 291, 292, 294 (BIA 1996), the BIA held that a California statute imposing criminal penalties on one who "willfully inflicts upon any person with whom he or she is cohabiting [corporal injury]," constitutes a CIMT. *Id.* at 292. In reaching this conclusion, the BIA underscored the dependent relationship among family members: "A person who cohabits with or is the parent of the offender's child maintains a relationship of a familial nature with the perpetrator of the harm. This relationship is likely to be one of trust and ... dependency .... Violence between the parties of such a relationship is different from that between strangers or acquaintances, which may or may not involve moral turpitude, depending on the nature of the offense as delineated by statute." *Id.* at 294. The California statute, however, is readily distinguishable from the Pennsylvania simple assault statute. Conviction under subpart 2701(b)(2) is possible absent the special relationship of dependence between the defendant and victim that the BIA perceived as critical in *Matter of Tran.* Under Pennsylvania law, the assailant and the complainant, indeed, may be strangers. Hence, *Matter of Tran* does not persuade us that a conviction under subpart 2701(b)(2) reflects the requisite depravity to constitute a CIMT.

11. The unusual circumstances of *Silva–Trevino's* referral to, and adjudication by, the Attorney General bear mention. After the IJ determined that Silva–Trevino's conviction under section 2.11(a)(1) of the Texas Penal Code constituted a CIMT, rendering him removable, the BIA, applying the categorical approach, concluded that his conviction did not meet the criteria for a CIMT and, accordingly, vacated the decision of the IJ and remanded the case. Subsequently, while the case was pending before the IJ, the Attorney General certified the case to himself *sua sponte.* Despite requests by Silva–Trevino's counsel, the Attorney General refused to identify the issues to be considered, to define the scope of his review, to provide a briefing schedule, or to apprise counsel of the applicable briefing procedure. In fact, neither the IJ decision nor the Attorney General's certification order were made publicly available, thus denying stakeholders, including immigrant and refugee advocacy organizations, the opportunity to register their views. As a result, the first opportunity of *amici curiae* to file comment was *after* entry of the Attorney General's opinion. *See* Br. of *Amici Curiae* American Immigration Lawyers Ass'n, Florence Immigrant and Refugee Rights Project, Immigrant Defense Project of the N.Y. State Defenders Ass'n, Immigrant Legal Resource Ctr., Nat'l Immigration Project of the Nat'l

eral's novel methodology departs from our precedents in two significant respects.

First, *Silva–Trevino* alters the focus of the categorical analysis. Under the categorical approach that we followed in *Partyka*, consistent with Supreme Court case law, we look to the elements of the statutory offense to ascertain the least culpable conduct hypothetically necessary to sustain a conviction under the statute. *Partyka*, 417 F.3d at 411. Under our precedents, the possibility of conviction for non-turpitudinous conduct, however remote, is sufficient to avoid removal; proof of actual application of the statute of conviction to the conduct asserted is unnecessary. "As a general rule, a criminal statute defines a crime involving 'moral turpitude only if *all* of the conduct it prohibits is turpitudinous.'" *Id.* (internal citation omitted) (emphasis added).

*Silva–Trevino* eschews our approach of analyzing the least culpable conduct hypothetically sufficient to sustain conviction, in favor of a "realistic probability" test. 24 I. & N. Dec. at 697. Under this approach, "in evaluating whether an alien's prior offense is categorically one that involved moral turpitude, immigration judges should determine whether there is a 'realistic probability, not a theoretical possibility,' that a State or Federal criminal statute would be applied to reach conduct that does not involve moral turpitude." *Id.* at 689–90 (citation omitted). To demonstrate a "realistic probability" of conviction, the alien must identify an actual conviction for comparable conduct. *Silva–Trevino* explained,

[The "realistic probability" approach] focuses the adjudicator on a criminal statute's actual scope and application and tailors the categorical moral turpitude inquiry by asking whether, at the time of an alien's removal proceeding, any actual (as opposed to hypothetical) case exists in which the relevant criminal statute was applied to conduct that did not involve moral turpitude. If the statute has not been so applied in any case (including the alien's own case), the adjudicator can reasonably conclude that all convictions under the statute may categorically be treated as ones involving moral turpitude. In such circumstances, the history of adjudication generally establishes no realistic probability that the statute, whatever its language may hypothetically allow, would actually be applied to acts that do not involve moral turpitude.

*Id.* (internal citation omitted) (emphasis added).

Second, *Silva–Trevino* renders the strict "categorical" approach not "categorical." Prior to *Silva–Trevino*, we departed from a strict categorical analysis only where the statute of conviction featured disjunctive variations, some of which were sufficient for conviction of the federal offense and others of which were not. "We depart farther from the formal categorical approach only where the language of a particular subsection [of a statute] ... invites inquiry into 'the underlying facts of the case.'" *Evanson v. Att'y Gen.*, 550 F.3d 284, 291–92 (3d Cir.2008) (internal citation omitted). In such a case, we modified the approach, but our inquiry remained a lim-

Lawyers Guild, Nat'l Immigrant Justice Ctr., Refugio del Rio Grande, Inc., and Washington Defenders Ass'n Immigration Project in Support of Reconsideration, filed Dec. 5, 2008, *available at* http://www.immigrantdefenseproject.org/docs/08_SilvaTrevinoAmicusBrief.pdf.

The *amici curiae* brief in support of reconsideration echoes many of the concerns we express herein and, although no challenge to these procedures is before us, the lack of transparency, coupled with the absence of input by interested stakeholders, only serves to dissuade us further from deferring to the Attorney General's novel approach.

ited one, focused on the crime of conviction: we reviewed only the record of the conviction to ascertain the particular variation of the statute under which the defendant was convicted. *See Singh,* 383 F.3d at 147–48; *Joseph v. Att'y Gen.,* 465 F.3d 123, 127 (3d Cir.2006). Accordingly, the focus under the categorical approach has always been the conviction, aimed at determining exactly what the defendant was convicted of.

*Silva–Trevino,* by contrast, directs adjudicators to depart from a categorical approach, and to conduct an "individualized moral turpitude inquiry," in every instance in which a "categorical analysis is not conclusive" as to whether the alien was convicted of a CIMT. 24 I. & N. Dec. at 700. The aim of this "individualized" inquiry is to ascertain the alien's particular acts—to determine "whether the facts of the alien's prior conviction in fact involved moral turpitude"—not merely to determine the elements of the statutory offense of which the alien was convicted. *Id.* at 700, 708.

Rather than limiting the CIMT inquiry to an examination of the formal record of conviction, which could include the charging document, the terms of the plea agreement or transcript of the colloquy between judge and defendant in which the factual basis for the plea is confirmed by the defendant, or some comparable judicial record of this information, *Shepard,* 544 U.S. at 26, 125 S.Ct. 1254; *Evanson,* 550 F.3d at 291, *Silva–Trevino* abandons these restrictions: "I [Attorney General] conclude that the evidentiary limitations of

*Taylor* and *Shepard* do not apply for purposes of making moral turpitude determinations." 24 I. & N. Dec. at 702. Hence, an adjudicator may, in his or her discretion, consider not only evidence from the prior criminal proceedings but also "*any* additional evidence or factfinding the adjudicator determines is necessary or appropriate to resolve accurately the moral turpitude question." *Id.* at 687 (emphasis added). *Silva–Trevino* sets no limitations on the kinds of evidence adjudicators may consider.

▋ The Attorney General asserts that two aspects of the INA support his authority to direct courts to employ his novel approach and compel our deference. First, he contends that the CIMT provisions in the immigration statute are ambiguous. He urges that Congress employed conflicting terminology, alternately using "convicted of" and "committed" throughout the statute. In the Attorney General's view, these terms, which cut in "different directions," do not endorse a single methodology for adjudicating CIMT cases, but rather confer discretion on the Attorney General to define a reasonable approach. *Id.* at 693. Second, the Attorney General urges that the phrase "crime *involving* moral turpitude" invites, if not requires, a fact-intensive inquiry as to whether the underlying conduct was turpitudinous. *Id.* The Attorney General urges that deference is owed to his interpretation of these provisions, and that the methodology that he espouses is obligatory, notwithstanding our contrary precedents.[12]

---

**12.** As a general rule, an agency's construction of an ambiguous statute under its purview, and in which it has special expertise, is entitled to deference. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 982, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ("*Chevron's* premise is that it is for agencies, not courts, to fill statutory gaps."); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694

(1984); *Knapik,* 384 F.3d at 88. The INA delegates to the Department of Justice authority to interpret and implement its provisions. *See* section 102(a)(1) of the INA, 8 U.S.C. § 1103(a)(1).

However, where Congress has spoken clearly on the precise issue, no deference is owed to the agency's interpretation of a statute. *See Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778 ("If a court, employing traditional

We conclude that we are not bound by the Attorney General's view because it is bottomed on an impermissible reading of the statute, which, we believe, speaks with the requisite clarity. The ambiguity that the Attorney General perceives in the INA is an ambiguity of his own making, not grounded in the text of the statute, and certainly not grounded in the BIA's own rulings or the jurisprudence of courts of appeals going back for over a century.[13]

The specific ambiguity is as to the use of the words "convicted" and "committed." The inclusion of "committed," the Attorney General urges, permits inquiry into any and all acts—whether or not admitted by the alien, and whether or not established by the record of conviction—to determine whether the petitioner was convicted of a CIMT. To say that this reading has been rejected is an understatement: the BIA,[14] prior attorneys general,[15] and numerous

---

tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *Chowdhury v. INS,* 249 F.3d 970, 973 (9th Cir.2001) (noting that deference under *Chevron* "presupposes some ambiguity in the governing statute"); *Beltran–Tirado v. INS,* 213 F.3d 1179, 1185 & n. 10 (9th Cir.2000); *see In re Velazquez–Herrera,* 24 I. & N. Dec. 503, 513 (B.I.A.2008). Further, where an agency interpretation reflects an impermissible construction of the statute, we will not defer to the agency's view. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *Okeke v. Gonzales,* 407 F.3d 585, 588 (3d Cir.2005) (noting that deference is only appropriate where agency's resolution of ambiguity is predicated on a "permissible construction of the statute" (quoting *Fatin v. INS,* 12 F.3d 1233, 1239 (3d Cir.1993))).

13.  In the case, *In re Velazquez–Herrera,* the BIA explained the historical roots of the categorical approach:

> For nearly a century, the Federal circuit courts of appeals have held that where a ground of deportability is premised on the existence of a "conviction" for a particular type of crime, the focus of the immigration authorities must be on the crime of which the alien was convicted, to the exclusion of any other criminal or morally reprehensible acts he may have committed. *See, e.g., Dalton v. Ashcroft,* 257 F.3d 200, 204–05 (2d Cir.2001); *Goldeshtein v. INS,* 8 F.3d 645, 647 (9th Cir.1993); *Okabe v. INS,* 671 F.2d 863, 865 (5th Cir.1982); *Tseung Chu v. Cornell,* 247 F.2d 929, 935 (9th Cir.1957); *Ablett v. Brownell,* 240 F.2d 625, 627 (D.C.Cir.1957); *United States ex rel. Giglio v. Neelly,* 208 F.2d 337, 340–41 (7th Cir. 1953); *United States ex rel. McKenzie v. Savoretti,* 200 F.2d 546, 548 (5th Cir.1952); *United States ex rel. Robinson v. Day,* 51

F.2d 1022, 1022–23 (2d Cir.1931) (Hand, J.); *United States ex rel. Mylius v. Uhl,* 210 F. 860, 862–63 (2d Cir.1914).
24 I. & N. Dec. at 513; *see United States v. Williams,* 203 F. 155, 156 (D.C.N.Y.1913) (applying categorical approach and rejecting individualized inquiry into the alien's particular acts). Although we are generally reluctant to infer legislative intent from inaction, we find significant that Congress has retained the term "convicted" in the inadmissibility section, despite having amended the statute over forty times since 1952. 8 U.S.C. § 1182 (historical notes); *see In re Velazquez–Herrera,* 24 I. & N. Dec. at 515 ("[W]e must presume that Congress was familiar with that fact (applicability of categorical approach) when it made deportability under section 237(a)(2)(E)(i) depend on a 'conviction.' Had Congress wished to predicate deportability on an alien's actual conduct, it would have been a simple enough matter to have done so.") (internal citations omitted); *see also United States v. Wilson,* 290 F.3d 347, 356 (D.C.Cir.2002) ("Congress is presumed to preserve, not abrogate, the background understandings against which it legislates.").

14.  *See, e.g., Matter of Velazquez–Herrera,* 24 I. & N. Dec. at 513; *Matter of Babaisakov,* 24 I. & N. Dec. 306, 311 (BIA 2007); *Matter of Sweetser,* 22 I. & N. Dec. 709, 715 (BIA 1999); *Matter of Pichardo,* 21 I. & N. Dec. 330, 335 (BIA 1996); *Matter of Madrigal,* 21 I. & N. Dec. 323, 327 (1996); *Matter of Franklin,* 20 I. & N. Dec. at 868–69; *Matter of S——,* 2 I. & N. Dec. 559 (1947); *Matter of S——,* 2 I. & N. Dec. 353, 357 (1945); *Matter of N——,* 1 I. & N. Dec. 181 (BIA 1941).

15.  *See* Op. Of Hon. Cummings, 39 Op. Att'y Gen. 215 (AG 1938); Op. Of Hon. Cummings, 37 Op. Att'y Gen. 293 (AG 1933).

courts of appeals have repeatedly held that the term "convicted" forecloses individualized inquiry in an alien's specific conduct and does not permit examination of extra-record evidence.[16] It could not be clearer from the text of the statute—which defines "conviction" as a "formal judgment of guilt," and which explicitly limits the inquiry to the record of conviction or comparable judicial record evidence [17]—that the CIMT determination focuses on the *crime* of which the alien was *convicted*—not the specific *acts* that the alien may have *committed*. 8 U.S.C. § 1101(a)(48)(A). The statute presents no ambiguity.

Two recent opinions of the Second and Ninth Circuit Courts of Appeals buttress this conclusion—*Gertsenshteyn v. U.S. Dept. of Justice*, 544 F.3d 137 (2d Cir.2008) and *Tokatly v. Ashcroft*, 371 F.3d 613, 622 (9th Cir.2004). Although these opinions address "convicted" in the context of different removal provisions, Congress has prescribed a single definition of "convict-

---

**16.** In *Gonzales v. Duenas–Alvarez,* upon which the Attorney General relies, the Supreme Court underscored federal courts' uniform application of the categorical, and modified categorical, approach. 549 U.S. 183, 185–86, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007); *Matter of Babaisakov,* 24 I. & N. Dec. at 311 ("We [BIA] have also traditionally applied an analysis that closely resembles the categorical approach to determine whether an alien has a 'conviction' that falls within a federally defined category of crimes leading to deportation.").

Although courts employ different labels to describe the categorical and modified categorical approaches, the fundamental methodology is the same. Each court begins with an analysis of the statute of conviction. If the statute of conviction is divisible, defining variations of the same offense, some of which would constitute a CIMT and others of which would not, inquiry into the record of conviction is permissible solely to determine the particular subpart under which the alien was convicted. Otherwise, scrutiny of the alien's particular acts is prohibited. *See, e.g., Partyka,* 417 F.3d at 416; *Bejarano–Urrutia v. Gonzales,* 413 F.3d 444, 450 (4th Cir.2005); *Chanmouny,* 376 F.3d at 812; *Cabral v. INS,* 15 F.3d 193 (1st Cir.1994); *Gonzalez–Alvarado v. INS,* 39 F.3d 245 (9th Cir.1994); *Okabe v. INS,* 671 F.2d 863 (5th Cir.1982); *United States ex rel. Guarino v. Uhl,* 107 F.2d 399 (2d Cir.1939). The Seventh Circuit Court of Appeals alone has recently abandoned the categorical approach in moral turpitude cases. *See Ali v. Mukasey,* 521 F.3d 737 (7th Cir. 2008).

**17.** The INA provides:

In any proceeding under this chapter, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:

(i) An official record of judgment and conviction.

(ii) An official record of plea, verdict, and sentence.

(iii) A docket entry from court records that indicates the existence of the conviction.

(iv) Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.

(v) An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.

(vi) Any document or record prepared by, or under the direction óf, the court in which the conviction was entered that indicates the existence of a conviction.

(vii) Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

8 U.S.C. § 1229a(c)(3)(B); *see Conteh v. Gonzales,* 461 F.3d 45, 54 (1st Cir.2006) ("[T]he regulation's catch-all provision authorizes the admission of evidence for the sole purpose of proving 'the existence of a criminal conviction,' 8 C.F.R. § 1003.41(d) (emphasis supplied); it does not authorize the admission of evidence for the purpose of proving the facts underlying the offense of conviction.").

ed," applicable to all removable offenses. *See* 8 U.S.C. § 1101(a)(1) and (48)(A) (defining "conviction").[18] Accordingly, we find the reasoning in these cases applicable to the CIMT provisions of the statute.

In *Tokatly v. Ashcroft*, the Ninth Circuit Court of Appeals concluded that a provision authorizing removal of an alien convicted of a crime of domestic violence required application of a categorical, or modified categorical, approach. 371 F.3d at 622. The Court stressed that this result flowed from Congress's inclusion of the word "convicted," a clear and unambiguous term:

> *Like all of the other removal provisions* we have analyzed in accordance with the categorical and modified categorical approach, the *plain language* of the "crime of domestic violence" provision clearly bases deportability on the nature of the alien's *conviction*, rather than on the alien's *actual conduct.* We are required to determine whether Tokatly has been "*convicted* of a crime of domestic violence"-not whether he *in fact committed* such a crime. INA § 237(a)(2)(E)(i) (emphasis added). That the removable offense at issue is a "crime of domestic violence" in no way warrants a reversal of our fundamental method of determin-

ing whether an alien has been convicted of a removable offense under the Act. *Id.* (emphasis added).

The Second Circuit Court of Appeals has concluded, similarly, that "convicted" mandates a categorical analysis. *Gertsenshteyn*, 544 F.3d at 145–46. In *Gertsenshteyn*, the court considered the validity of a novel framework, adopted by the BIA, for adjudicating "aggravated felony" convictions under 8 U.S.C. § 1101(a)(43)(K)(ii). 544 F.3d at 138. The BIA had specifically sought greater leeway to examine the particular conduct underlying an alien's prior conviction. As originally enacted in April 1996, § 1101(a)(43)(K)(ii) defined as an aggravated felony the commission of "an offense that . . . is described in any one of three federal statutory provisions [18 U.S.C. §§ 2421, 2422, and 2423] 'for commercial advantage.'" Departing from the categorical and modified categorical approaches, the BIA scrutinized evidence outside the record of conviction to ascertain whether the alien was, in fact, motivated by a desire "for commercial advantage." The court concluded that such an approach was foreclosed by the statute, which required "conviction" of an aggravated felony. The relevant passage in *Gertsenshteyn* is worth quoting at length:

> Our holding today is grounded in history-specifically, the history of why we have applied the categorical approach to

---

18. *See Duenas–Alvarez*, 549 U.S. at 185–86, 127 S.Ct. 815 ("In determining whether a *conviction* (say, a conviction for violating a state criminal law that forbids the taking of property without permission) falls within the scope of a *listed offense* (e.g., 'theft offense'), the lower courts *uniformly* have applied the approach this Court set forth in *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990).") (emphasis added); *see also Chowdhury*, 249 F.3d at 973 ("When analyzing a statute we . . . mak[e] every effort not to interpret a provision in a manner that

renders other provisions of the same statute inconsistent.'" (quoting *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir.1991))); *Tokatly*, 371 F.3d at 622; *United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir.2000) (quoting *United States v. Bonanno Organized Crime Family*, 879 F.2d 20, 24 (2d Cir.1989)) ("[W]e must 'interpret [a] specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.'") (internal citations omitted).

aggravated felony inquiries in the removal context. The primary reason was that 8 U.S.C. § 1227(a)(2)(A)(iii)-the provision of the INA that renders an alien removable for having been convicted of an aggravated felony (leaving to provision 8 U.S.C. § 1101(a)(43) the definition of "aggravated felony")-uses the word "convicted." That is, the INA premises removability not on what an alien has done, or may have done, or is likely to do in the future (tempting as it may be to consider those factors), but on what he or she has been formally *convicted* of in a court of law. . . .

One way to ensure proper focus on the conviction, we decided, was the method the Supreme Court applied in *Taylor* and *Shepard. See Ming Lam Sui v. INS*, 250 F.3d 105, 116–17 (2d Cir. 2001) (stating that "the *Taylor* opinion provides valuable guidance" to a determination of whether an alien's offense constitutes an "aggravated felony" under the INA because, like the statute at issue in *Taylor*, "§ 1227(a)(2)(A)(iii) renders deportable an alien who has been 'convicted' of an aggravated felony, not one who has 'committed' an aggravated felony"). We also reasoned (1) that "nothing in the legislative history [of 8 U.S.C. § 1227(a)(2)(A)(iii)] suggested a factfinding role for the BIA in ascertaining whether an alien had committed an aggravated felony, just as, in *Taylor*, nothing suggested such a role for the sentencing court in evaluating the factual basis of a prior burglary conviction," and (2) that "the practical evidentiary difficulties and potential unfairness associated with looking behind [an alien's] offense of conviction were no less daunting in the immigration [context] than in the sentencing context." *Dulal–Whiteway*, 501 F.3d at 125–26 (internal quotation marks and citations omitted). In sum, our use of the categorical approach emanates from our understanding of

what Congress intended when it drafted § 1227(a)(2)(A)(iii), a provision that, like the provision in *Taylor* and *Shepard*, requires the Government to prove the existence of a qualifying *conviction* in order to make its case.

*Id.* at 145–46 (emphasis in original). Although the Court construed "conviction" in the context of the aggravated felony provision, the Court made clear that its rejection of the BIA's fact-intensive inquiry was premised on "conviction"—a statutorily defined term—*not* on the particular offense for which removal was sought:

> In the precedential opinion that the BIA issued in this case, it has taken a new approach. But it has done so not by reinterpreting 8 U.S.C. § 1227(a)(2)(A)(iii), the provision whose wording led it-and us-to adopt the categorical approach in the first place. Rather, it has focused entirely on a subpart of § 1101(a)(43), the provision of the INA that defines "aggravated felony." The BIA has authority to interpret that provision, and its interpretation-specifically, its sensible reading of the phrase "commercial advantage"-may well merit deference should the BIA reassert it in this case (on remand) or in others. But the BIA's discussion of § 1101(a)(43)(K)(ii) gives us no reason to depart from its, and our own, precedents regarding the more fundamental question of what is required of the agency-in the interests of both fairness and efficiency-when an alien's removability hinges on the existence of a prior *conviction*.

*Id.* at 146 (emphasis added); *Conteh*, 461 F.3d at 54; *Chang v. INS*, 307 F.3d 1185, 1190 & n. 2 (9th Cir.2002) (noting that term "conviction" necessarily limits inquiry to the elements of the statute of conviction and the record of conviction); *In re Velazquez–Herrera*, 24 I. & N. Dec. at 513

(noting that "convicted" requires the "focus" of the immigration authorities to be on the "crime of which the alien was *convicted,* to the exclusion of any other criminal or morally reprehensible acts he may have *committed.*") (emphasis added).[19]

We also take issue with the Attorney General's view that the phrase "crime *involving* moral turpitude" invites inquiry into an alien's specific acts. The Attorney General's argument is premised on a fundamental misreading of the relevant language. The Attorney General views "crime" and "involving moral turpitude" as distinct grammatical units and, accordingly, reasons that the clause "involving moral turpitude" modifies "crime." He thus concludes that Congress intended to authorize inquiry into whether an alien committed the offense in a manner reflecting depravity—that is whether the alien's particular acts "involv[ed] moral turpitude." The Attorney General's view, however, overlooks a crucial fact: crime involving moral turpitude is a term of art, predating even the immigration statute itself. *See Jordan v.*

*De George,* 341 U.S. 223, 227, 71 S.Ct. 703, 95 L.Ed. 886 (1951); *Baxter v. Mohr,* 37 Misc. 833, 76 N.Y.S. 982 (1902). As such, its division into a noun and subordinate clause, as the Attorney General seeks to do, distorts its intended meaning. It refers to a specific class of offenses, not to all conduct that happens to "involve" moral depravity, because of an alien's specific acts in a particular case. Because the Attorney General's position is premised on a clearly erroneous interpretation of "crime involving moral turpitude," no deference is owed to his view.

Moreover, although the Attorney General observes—correctly—that "moral turpitude" is rarely an element of the underlying crime triggering removal,[20] it is the offense that must be scrutinized for the requisite degree of depravity. Because the INA requires the conviction of a *crime*—not the commission of an *act*—involving moral turpitude, the central inquiry is whether moral depravity inheres in the crime or its elements-not the alien's underlying conduct.[21] In this way, the

---

**19.** Because "convicted" has an unambiguous meaning, the Attorney General must find support for his novel approach elsewhere in the statute. The Attorney General attempts to do just that, citing 8 U.S.C. § 1182(a)(2)(A)(i)(I), section 212(a)(2)(A)(i)(I). However, that section, addressing acts specifically "admitted" by the alien in the underlying criminal proceeding, is narrowly drawn; it does *not* confer limitless discretion on immigration judges to examine "any additional evidence" deemed "appropriate." *Silva–Trevino,* 24 I. & N. Dec. at 687; *see Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *In re Velazquez–Herrera,* 24 I. & N. Dec. at 507 ("If that [statutory] language constitutes a plain expression of congressional intent, it must be given effect."); *see also Conteh,* 461 F.3d at 58 ("It seems obvious to us that the record of conviction cannot encompass after-the-fact statements made in a separate and subsequent proceeding."). The

Attorney General's reliance on section 212(a)(2)(A)(i)(I) as support for a far-reaching inquiry into an alien's specific acts is thus misplaced.

**20.** In *United States v. Uhl,* decided almost one hundred years ago, the court acknowledged the possibility that the statute would be both overinclusive and underinclusive, but noted that the interest in administrative efficiency justified this result. 203 F. 152, 153 (S.D.N.Y.1913).

**21.** *See Matter of Pichardo,* 21 I. & N. Dec. at 335 ("As this Board and the courts have consistently held in cases addressing the issue of whether an alien is deportable under section 241(a)(2)(A)(i) of the Act for having been convicted of a crime involving moral turpitude, it is the nature of the crime, as defined by statute and interpreted by the courts and as limited and described by the record of conviction, which determines whether an alien falls within the reach of that law.").

concept of a crime involving moral turpitude does not lend itself to an examination of acts, rather than elements of the crime, any more than does the concept of "crime of violence" under section 101(a)(43)(F) of the INA. *See* 18 U.S.C. § 1101(a)(43)(F) (defining "aggravated felony" as including a "crime of violence"). Violence, like moral turpitude, is not an element of the underlying offense; rather, we must look at the elements of the crime and measure them against the requirement of "violence." *See Ng v. Att'y Gen.,* 436 F.3d 392, 396–97 (3d Cir.2006) (applying categorical approach to determination of whether conviction constitutes a "crime of violence" under section 101(a)(43)(F)); *see also Shepard,* 544 U.S. at 14, 125 S.Ct. 1254 (limiting cognizable evidence to record of conviction in determining whether prior conviction was for "violent felony" under the Armed Career Criminal Act); *Tokatly,* 371 F.3d at 622 ("That the removable offense at issue is a 'crime of domestic violence' in no way warrants a reversal of our fundamental method of determining whether an alien has been *convicted* of a removable offense under the Act."). The use of the term "involves" in "crime involving moral turpitude" is no more expansive than the word "of" in "crime of violence."

Nor do we believe that, as a practical matter, determination of whether a conviction "fits" the requirements of a CIMT requires examination of an alien's underlying conduct. We are aware that the Seventh Circuit Court of Appeals recently reached a contrary conclusion in *Ali v. Mukasey,* upon which the Attorney General relies in *Silva–Trevino.* 521 F.3d at 741–42. In *Ali,* the Seventh Circuit Court of Appeals concluded, "The need to decide whether a crime is one of 'moral turpitude' ... may require some additional information, since the charging papers that led to the prior conviction are not framed with such classifications in mind...." *Id.* Because the Seventh Circuit represents the sole court of appeals to approve such a far-reaching inquiry in the CIMT context, we consider its holding and reasoning in some detail.

In *Ali,* the court initially acknowledged its precedents applying the categorical approach set forth in *Shepard* and *Taylor. Id.* at 741; *see Hashish v. Gonzales,* 442 F.3d 572, 575 (7th Cir.2006); *Padilla v. Gonzales,* 397 F.3d 1016, 1019 (7th Cir. 2005). The court, however, then abandoned these precedents, providing three grounds for its decision: that (1) the rationale for application of the categorical approach in criminal proceedings is inapplicable in the immigration context; (2) scrutiny of an alien's specific acts is necessary to determine whether a prior conviction fits the criteria of a CIMT; and (3) a recent decision of the BIA permits examination of extra-record evidence in conducting the CIMT inquiry, *see Matter of Babaisakov,* 24 I. & N. Dec. at 311. None of these reasons withstands scrutiny.

First, the court reasons that the twin rationales for the categorical approach articulated in *Taylor*—simplicity of application and conservation of judicial resources—do not "come into play" in the immigration context. *Ali,* 521 F.3d at 741. We respectfully disagree. Administrative efficiency and ease of application are equally, if not more, important in the immigration context than in criminal proceedings. *See Gertsenshteyn,* 544 F.3d at 146 (noting that "the practical evidentiary difficulties and potential unfairness associated with looking behind [an alien's] offense of conviction were no less daunting in the immigration [context] than in the sentencing context"). As the Ninth Circuit Court of Appeals, a circuit experienced with managing crowded immigration dockets, recently explained, "If we were to allow evidence that is not part of the rec-

ord of conviction as proof of whether an alien falls within the reach of [an INA removal provision], we essentially would be inviting the parties to present any and all evidence bearing on an alien's conduct leading to the conviction.... Such an endeavor is inconsistent ... with the streamlined adjudication that a deportation hearing is intended to provide." *Tokatly*, 371 F.3d at 621 (quoting *Matter of Pichardo*, 21 I. & N. Dec. at 335). Yet, the "invitation" that *Tokatly* strives to avoid is extended to the parties in *Ali*: "[W]e now conclude that when deciding how to classify convictions under criteria that go beyond the criminal charge-such as ... whether the crime is one of 'moral turpitude,' the agency has the discretion to consider evidence beyond the charging papers and judgment of conviction." *Ali*, 521 F.3d at 743. *Ali* sets no limitation on the evidence admissible to establish an alien's underlying conduct.

*Ali* dismisses the administrative implications of its ground-breaking approach, reasoning that immigration judges may devote as much, or as little, time to examination of an alien's specific conduct as they see fit. *Id.* at 741. The court reasons that whether an individualized inquiry would be unduly burdensome is an issue for the agency, not the judiciary, to decide: "And how much time the agency wants to devote to the resolution of particular issues is, we should suppose, a question for the agency itself rather than the judiciary." *Id.* We need not weigh the respective costs and benefits of a fact-intensive approach, or divine the agency's view on the matter, as the BIA has already spoken clearly and unequivocally. If *Ali* refers the "question" to the BIA, *id.*, the agency has previously answered it:

> If we were to make an exception here and accept the respondent's testimony as proof of his deportability ... there would be no clear stopping point where this Board could limit the scope of seem-ingly dispositive but extrinsic evidence bearing on the respondent's deportability. We believe that the harm to the system induced by the consideration of such extrinsic evidence far outweighs the beneficial effect of allowing it to form the evidentiary basis of a finding of deportability.

*Matter of Pichardo*, 21 I. & N. Dec. at 335-36 (internal citation omitted).

Notwithstanding the agency's prior rejection of a fact-intensive inquiry, the court in *Ali* reasons that such an approach is necessary to determine whether a prior conviction satisfies the criteria of a CIMT, since "moral turpitude" is rarely an element of the statute of conviction. But, this problem of "fit"—the virtually inevitable incongruity between the statute of conviction and the elements of a CIMT—is not of recent vintage. Writing nearly a century ago, Judge Noyes identified this as an inevitable byproduct of the categorical approach:

> It is true that ... some aliens who have been convicted of high crimes may be excluded although their particular acts evidence no immorality and that some who have been convicted of slight offenses may be admitted although the facts surrounding their commission may be such as to indicate moral obliquity. But such results always follow the use of fixed standards and such standards are, in my opinion, necessary for the efficient administration of the immigration laws.

*Uhl*, 203 F. at 153. In the intervening one hundred years since *Uhl* was decided, adjudicators have applied the categorical approach to the CIMT inquiry without great difficulty. *See also In re Velazquez–Herrera*, 24 I. & N. Dec. at 513. *Ali* fails to identify a significant development—legal, policy, or otherwise—justifying departure from our historic approach.

Even if we were inclined to find, as did the court in *Ali*, that an individualized inquiry would enable more precise determinations regarding removal, and that this benefit outweighed the administrative burden created, we believe our discretion to adopt such an approach to be foreclosed by the immigration statute itself, which predicates removal on *convicted* conduct, and which, we conclude, expressly limits our inquiry to the official record of judgment and conviction, or other comparable judicial record evidence. 8 U.S.C. §§ 1229a(c)(3)(B), 1101(a)(48)(A); *see Conteh*, 461 F.3d at 54; *cf. Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

Lastly, the Seventh Circuit Court of Appeals reasons that a recent opinion of the BIA, *Matter of Babaisakov*, warrants abandoning its precedents applying the categorical approach to CIMT cases. 24 I. & N. Dec. at 311. *Babaisakov*, however, does not support the far-reaching inquiry that the court adopts in *Ali*. There, the BIA examined evidence outside the record of conviction for the narrow purpose of determining whether the monetary threshold for removal under section 101(a)(43)(M) was met. Section 10 1(a)(43)(M) authorizes removal of an alien who is convicted of an offense that "involves fraud or deceit in which the loss to the victim or victims *exceeds $10,000.*" (emphasis added). In approving resort to reliable evidence outside the record of conviction to determine the loss amount, the BIA stressed that a categorical approach would

be unworkable, as there is no federal or state fraud statute that contains an element requiring loss to the victims exceeding $10,000. *Id.* at 315.

Shortly after *Matter of Babaisakov* was decided, we adopted a position similar to that of the BIA and, eschewing a categorical approach, held that section 101(a)(43)(M)'s monetary requirement did not require jury determination of the amount of victim loss in the underlying criminal proceeding. *Nijhawan v. Att'y Gen.*, 523 F.3d 387, 391–92 (3d Cir.2008). We reasoned, as the BIA did in *Matter of Babaisakov*, that a contrary approach, requiring a loss amount to have been ascertained by the jury in the prior criminal proceeding, would essentially gut this basis for removal and "impose a totally impractical standard." *Id.*

The practical impediments to application of the categorical approach identified in *Nijhawan* and *Babaisakov*, however, are not present in the CIMT context. The BIA and courts of appeals have determined whether moral turpitude inheres in the convicted conduct using a categorical approach for over a century. Hence, *Nijhawan* and *Babaisakov* do not support abandoning our established methodology.

Because we conclude that *Ali* misunderstands the import of *Babaisakov*, violates clear statutory language requiring proof of actual conviction, and ignores the BIA's pronouncement that a fact-intensive inquiry would be unduly burdensome, we do not feel compelled to follow it.[22]

---

**22.** In *Silva–Trevino*, the Attorney General posits a series of policy arguments to justify abandoning the categorical approach—that an individualized inquiry would minimize the impact of differences in state criminal codes on CIMT adjudication, and remedy the current fractured approach to the CIMT issue, in which courts of appeals apply different methodologies. These policy benefits are largely beside the point. Congress has spoken clearly and unambiguously and, therefore, the agency is not free to disregard Congress's judgment, merely because it believes that it has fashioned a better alternative, or that Congress's approach is ill-advised. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *In re Velazquez–Herrera*, 24 I. & N. Dec. at 514 ("The principal difficulty with the DHS's position is that we simply have no authority to consider ... policy matters except as they may bear on the proper interpretation of an otherwise ambiguous statute.").

The other aspect of *Silva–Trevino*—requiring proof of a "realistic probability" that the statute of conviction would be applied to non-turpitudinous conduct—is also wrong-headed. This concept originated in *Duenas–Alvarez*, 549 U.S. at 185–86, 127 S.Ct. 815. There, the Supreme Court considered whether conviction under a California statute, imposing criminal penalties not only on one who takes a vehicle without consent but also on one who is an accessory or accomplice to such an unauthorized taking, constitutes a "theft offense" under the 8 U.S.C. § 1101(a)(43)(G), and is thus removable. The alien urged that, as a result of California courts' application of the "natural and probable consequences" doctrine, the California statute criminalized conduct that is not "theft" and thus does not warrant removal. Rejecting the alien's view of the statute, the Supreme Court reasoned that states routinely punish conduct of an accomplice to theft as "theft," and stated: "[I]n our view, to find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal imagination to a state statute's language. It requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." *Id.* at 193, 127 S.Ct. 815. Concluding that the alien had merely articulated a theoretical possibility that the California statute would apply where the defendant did not intend to commit the crimes resulting from his acts, the Court concluded that the statute "fit" the generic definition of a "theft offense."

Curiously, the phrase "realistic probability" has been imported into the CIMT context, with several courts reasoning that an alien may avoid removal only if he demonstrates a "realistic probability" that non-turpitudinous conduct would, indeed, be prosecuted as a crime under the particular statute at issue. *See, e.g., Nicanor–Romero v. Mukasey,* 523 F.3d 992, 1005–1006 (9th Cir.2008); *United States v. Becerril–Lopez,* 528 F.3d 1133, 1141 (9th Cir. 2008); *Martinez v. Mukasey,* 551 F.3d 113, 119 n. 6 (2d Cir.2008); *United States v. Diaz–Ibarra,* 522 F.3d 343, 348 (4th Cir. 2008). We seriously doubt that the logic of the Supreme Court in *Duenas–Alvarez,* however, is transferable to the CIMT context. In *Duenas–Alvarez,* the hypothetical conduct asserted by the alien was not clearly a violation of California law. In fact, the parties vigorously disputed whether California courts would permit application of the statute to a defendant who had committed acts *resulting* in a crime, but where the commission of the crime itself was not intended. Here, by contrast, no application of "legal imagination" to the Pennsylvania simple assault statute is necessary. The elements of 2701 are clear, and the ability of the government to prosecute a defendant under subpart 2701(b)(2)—even where the defendant is unaware of the victim's age—is not disputed.[23] With all due respect to our sister courts of appeals who have imposed this additional step in light of *Duenas–Alvarez,* we view the situation here as sufficiently different from that of *Duenas–Alvarez* to raise serious doubts as to its applicability.

Other considerations support our refusal to import a "realistic probability" test into the CIMT context. As the Ninth Circuit Court of Appeals explained in *Nicanor–*

**23.** *See United States v. Grisel,* 488 F.3d 844, 850 (9th Cir.2007) (en banc) ("Where, as here, a state statute explicitly defines a crime more broadly than the generic definition, no 'legal imagination,' *Duenas–Alvarez,* 127 S.Ct. at 822, is required to hold that a realistic probability exists that the state will apply its statute to conduct that falls outside the generic definition of the crime. The state statute's greater breadth is evident from its text."); *Becerril–Lopez,* 528 F.3d at 1141.

*Romero,* "[T]his court and others have developed a substantial body of case law deciding whether various state criminal statutes fall within the scope of the 'crime involving moral turpitude' offense." 523 F.3d at 1004. This jurisprudence has provided predictability, enabling aliens better to understand the immigration consequences of a particular conviction. *See id. Duenas–Alvarez* did not purport to alter our and other courts of appeals' case law regarding the examination of the least culpable criminal conduct in resolving the CIMT issue. As the en banc court in *Nicanor–Romero* noted, the issue is not whether potential offenders have been prosecuted; rather, the issue is whether everyone prosecuted under that statute has necessarily committed a CIMT. 523 F.3d at 1072.

Also unanswered is whether the government or the alien bears the burden of demonstrating a prior application of the statute of conviction to non-turpitudinous conduct, and the applicability of unreported criminal cases. *Id.* Although the INA allocates the burden of establishing removability to the government, *see Notash v. Gonzales,* 427 F.3d 693, 697 (9th Cir.2005), *Duenas–Alvarez* appears to shift this burden to the alien, indicating that he must "show that the statute was so applied in his own case" or point to "other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues." 549 U.S. at 194, 127 S.Ct. 815; *see Nicanor–Romero,* 523 F.3d at 1004. These unresolved questions strengthen our conclusion that the Supreme Court never intended a sea-change in our case law regarding the methodology for determining whether an alien has been convicted of a CIMT.

Based on the foregoing analysis, we will not defer to the methodology adopted by the Attorney General, which we conclude is predicated on an impermissible reading of the INA, is contrary to Congress's intent, and would overturn nearly a century of jurisprudence. Accordingly, we will follow our established methodology for adjudicating crimes involving moral turpitude, as set forth in *Partyka,* and conclude that Jean–Louis was not convicted of a CIMT.

## III. Conclusion

For the foregoing reasons, we will GRANT the petition, REVERSE the order of the BIA, and REMAND the case to the BIA for further proceedings consistent with this Opinion.